FIRST NATIONAL BANK IN ST. LOUIS, a Corporation, and UNIVERSITY CITY v. WEST END BANK OF UNIVERSITY CITY, a Corporation, O. H. MOBERLY, Commissioner of Finance of the State, in Charge of the WEST END BANK OF UNIVERSITY CITY, Appellants.

W. S. STEELE, Collector, and DAVID L. MILLAR, Mayor, v. WEST END BANK OF UNIVERSITY CITY, in Liquidation, Appellant.—129 S. W. (2d) 879.

Division One, June 14, 1939.

*Williams, Nelson & English* and *R. F. O'Bryen*, for appellants.

836

*Marvin E. Boisseau* for respondents.

HYDE, C.—This is a proceeding to determine the rights of the parties in a certain fund placed in the custody of the court, in an interpleader action. This fund is claimed by both the City of

University City and the State Commissioner of Finance in charge of the liquidation of the West End Bank of University City. The total amount of this fund, which the trial court awarded to the City and its collector was $16,727.04. The Finance Commissioner, on behalf of the Bank, has appealed.

By stipulation of the parties the two above entitled cases were consolidated in the trial court and likewise the appeals therein have been consolidated here. The first cause originated as an interpleader suit filed in the Circuit Court of St. Louis County, by the First National Bank in St. Louis. The bill of interpleader alleged, that the First National Bank had in its possession the sum of $35,330.60 arising from the sale of United States Government bonds placed in escrow with it by the West End Bank of University City for the purpose of securing deposits made by the City of University City in the West End Bank as the City depository; that the West End Bank had been closed and was being liquidated by the Commissioner of Finance; that the City claimed the fund because the West End Bank had failed to pay to it money which had been deposited by the City Collector, and that the Commissioner of Finance took the position that the contract under which the bonds were placed in escrow with it did not cover moneys deposited with the West End Bank by the City Collector. Pursuant to a stipulation of the parties an order was entered sustaining the bill of interpleader, directing the First National Bank to pay the $35,330.60 to the clerk of the court (which was done and it was thereupon discharged) and ordering the defendants, City of University City and the West End Bank in charge of the Finance Commissioner for liquidation, to interplead and set up their respective claims to the fund, which was done. The issues arising upon defendants' interpleas constitute the first case. The second case arose upon a petition filed, in the same court, by the City, the Mayor and City Collector, "for and on behalf of said City," for "priority" of the claim made by the City against the West End Bank, in liquidation, for money deposited by the City Collector to his account with the bank, being the same deposits referred to in the interpleader suit; the petitioners asserting the claim should be allowed as a preferred claim and the Commissioner of Finance contending it is a general claim only. The trial court found for the City in both cases.

The City of University City, hereinafter referred to as the City, is a city of the fourth class. The West End Bank, a banking corporation organized under the laws of this State will be referred to as the Bank. The facts herein stated were developed largely by the evidence adduced on the part of the City. Pursuant to Section 7010, Revised Statutes 1929, the board of aldermen of the City adopted ordinances providing for the selection, annually, of a depository for the funds of the City for the term of one year corresponding with

its fiscal year. Prior to 1917, it was required that the depository give a surety company bond but in that year this requirement was changed to permit a bond by individual sureties. After 1930, the requirement was made that the depository secure the City deposits by an escrow arrangement similar to the one involved herein. The present controversy arises out of the depository contract for the fiscal year 1932-1933. Annually since 1915, the West End Bank had been selected and designated as the City depository. By ordinance No. 2071, adopted July 13, 1932, the Bank's "bid . . . as depository for all the funds" of the City was accepted and it was selected as such depository "during the period from July 13, 1932, to the first regular meeting of the board of aldermen . . . following the first day of July, 1933, and until a successor shall be selected." The ordinance next directed the *"City Treasurer to transfer all of the funds of said City to said bank* . . . provided said bank shall have entered into" an escrow agreement with the City in conformity with the terms therein set out, and which are incorporated in the agreement herein involved. The ordinance then referred to this contract, executed on same date as the ordinance, and approved same and provided that: *"The City Treasurer shall deposit all funds of said City with the West End Bank pursuant to the contract."* (Italics ours.) It will be noted here that the ordinance refers only to the deposit of funds in the custody of the City Treasurer.

The 1932-33 escrow agreement, dated July 13, 1932, entered into between the City and the Bank, approved by the foregoing ordinance, is the basis of the claim made by the City. The contract recited that the Bank has been selected "as a clearing house depository of the funds" of the City for the period aforesaid and the Bank agrees, that "upon the termination of this contract" it will "pay all" of the City's funds "then on deposit" with it "to the City Treasurer of said City"; that it will "pay upon presentation all checks drawn upon it by the proper officer of the City . . . whenever" the City "has on deposit with" it "sufficient funds with which to pay said checks;" that it will pay the City "interest at the rate of one per cent per annum on daily balances, said interest to be paid every thirty days; that "at each interest paying date" it "will render a statement in duplicate . . . one copy to the City Clerk . . . and the other copy to the Treasurer of said City, showing the daily balances of such City funds on deposit" with it "during the preceding month and accrued interest thereon." The contract further provided that: *"All funds that are deposited with"* the Bank *"by the Treasurer of the City* . . . *as such Treasurer,* during the life of this contract, *as well as all funds deposited in the name or to the credit of said City* . . . *shall be included in and secured by the terms of this contract."* (Our italics.) The contract next pro-

vided that, "in order to secure the payment of all funds of" the City "deposited with the" Bank "and of all indebtedness that may accrue from" the Bank of the City "under the terms hereof," the Bank "pledges" and "agrees to deliver to the First National Bank in St. Louis," as "depository agent," "to be held by said depository agent . . . as security for the funds of" the City "deposited with" it "and for any and all indebtedness accruing to" the City from the Bank "for failure to comply with the terms of this contract, . . . direct obligations of the Government of the United States . . . the market value of which shall always be at least $2500 in excess of the highest amount" the City "has on deposit with" the Bank "at any one time." The contract also provided that upon a properly authenticated demand by the City, the First National Bank shall "sell such securities or so much thereof as may be necessary to pay" the Bank's "obligations" to the City and "pay to the Treasurer of the City . . . the proceeds thereof, or all amounts due" the City "hereunder" and any proceeds remaining, less costs of sale, shall be paid to the Bank.

W. S. Steele was elected City Collector in 1925, served continuously thereafter, by re-election, and was still serving in that office in 1936, when this case was tried. At all times he was under bond to the City, executed by a surety company, securing the payment by him to the City Treasurer, at the time and in the manner specified by statute and ordinance, of all City taxes and other moneys collected by him and owing to the City. As City Collector he collected property taxes, license fees, gasoline taxes, and all other City levies. He deposited all his collections in the West End Bank, the City depository, to his credit as City Collector. He had the sole and exclusive control of the account. He drew checks on this account, from time to time, for commissions due him, for office expenses, for refunds of over-payments of taxes or fees, and in payment to the City clerk of clerk's fees for the issuance of various licenses. He testified that he wrote "hundreds" of refund checks (to correct mistakes in tax payments) on this account explaining how this became necessary. It is undisputed that he regularly complied with Section 7000, Revised Statutes 1929, requiring the City Collector (of a city of the fourth class) to "pay into the (city) treasury, monthly, all moneys received by him from all sources which may be levied by law or ordinance; also, all licenses of every description authorized by law to be collected, and all moneys belonging to the City which may come into his hands." In making his monthly settlements with the City Treasurer he computed the net amount due the City upon the collections made since his last settlement and remitted same, by check drawn on this account, to the City Treasurer, who receipted him therefor. Thereupon the City Treasurer deposited the remittance from the collector with the depository bank to the credit of the City or himself as treasurer of the City.

In computing the amount of bonds, which, in conformity with the escrow contract, the City, from time to time, required the depository bank to have on deposit with the First National Bank, only the amount of the deposits in the depository bank to the credit of the City treasury were taken into consideration. That is, the aggregate of the deposits made by the City Treasurer to his credit as City Treasurer, or by him to the credit of various City accounts, was the basis for computation of the total amount of bonds to be kept in escrow and the account of the City Collector was not included or considered in making such computation. While the Bank paid the same rate of interest (one per cent per annum on daily balances) on the account of the City Collector that it paid on deposits to the account of the City treasury, it did not include such interest in the statement and computation showing daily balances of City funds and the interest accrued thereon which it delivered monthly to the City clerk and City Treasurer. It accounted for and credited to the City, monthly, the accrued interest on the City funds covered by the depository agreement, but the interest on the City Collector's account was paid direct to the City Collector. He retained such interest, reporting and accounting therefor to the City only "at the end of the year." It thus appears that the account of the City Collector was not taken into consideration, by either the Bank or the City, prior to 1933, in computing the amount of bonds to be deposited to secure the funds covered by the depository contract, or in the accounting and payment of interest monthly to the credit of the City Treasurer.

Collector Steele after his first election deposited the City's funds collected by him in the University City Bank (a different institution), and continued to do so until some time in the following July. Soon after he took charge, the president of the West End Bank inquired where he was depositing the City collections. When he was told, he stated to Mr. Steele that the West End Bank was the City depository; that the money, which he was collecting, was City money and should be deposited in the City depository; and that if Collector Steele persisted in his refusal to deposit the City funds in the West End Bank he would take legal action to compel him to do so. Thereafter, in July, 1925, Collector Steele was called into a meeting of the Board of Alderman of the City. There were present at this meeting the Mayor, the entire Board of Aldermen, and the president and one of the directors of the West End Bank. The following resolution which had been adopted by the Board of Aldermen was then read to Collector Steele.

"After discussion, it was moved by Alderman Smith, seconded by Alderman Ruth that City Collector Steele be instructed to deposit all moneys received by the City Collector's office in the West End Bank, designated as depository for all funds of the City, and that

the heads of the various City departments receiving City funds also be instructed to deposit such moneys in the West End Bank; all City deposits to draw the same rate of interest as other City funds deposited in said Bank. Motion carried.''

Collector Steele was then told by the City Attorney that the Bank had been made the official City depository; that it was his duty by reason thereof to deposit all moneys he collected in the West End Bank; and that ''neither myself nor my bondsmen would be liable for one cent after the money was placed in the West End Bank.'' Steele also said: ''I never did investigate the terms of the escrow agreement with the First National Bank and the West End Bank (which of course was not in existence until 1932), but talked to the City Attorney and City Clerk about it.'' After July, 1925, Collector Steele deposited all the moneys collected by him as collector with the West End Bank, and continued to do so until July, 1934, when another depository was selected. After the Bank closings of 1933, the total amount of all City funds, together with the collector's account, was $169,457.69 (as shown by statement of April 29, 1933.) There were then eighteen separate accounts. One of these was the collector's unrestricted account and another his restricted account. Of the sixteen City accounts, five were sinking fund accounts (apparently for payments on bond issues); and three others were park funds. There was also the general fund, sanitary fund, engineers funds and street funds. All of these sixteen accounts, however, were funds ''that were allocated from moneys that had been paid into the Treasurer's account.''

The banking regulations, put into effect after March, 1933, restricted all accounts so that only five per cent thereof was subject to withdrawal. The Bank paid the unrestricted five per cent of the City Collector's account and has also since paid all of his account which consisted of new deposits made after the date of restriction. The Bank was never afterwards opened on an unrestricted basis. The sixteen City accounts were never restricted because they were secured by the bonds deposited under the escrow agreement. A new mayor was elected in 1933, and he insisted that the collector's restricted account be covered by bonds, saying, ''I will take this money (all City accounts) out unless it covers everything.'' He also said that ''in July, 1933, we were still having this protracted argument;'' that (about August, 1933) ''they finally capitulated and agreed to cover Mr. Steele;'' and that bonds were put in escrow in sufficient amount to cover the collector's account as well as all other accounts. Subsequently, under the terms of the depository agreement, the Bank paid in full to the City Treasurer all the accounts to the credit of the City in the sixteen accounts above mentioned. At that time (July, 1934) bonds were released in an amount equal to the total amount of the accounts paid, but the bonds in excess of the amount

necessary to pay these accounts remained in escrow. The Finance Commissioner, who took charge of the Bank in 1935, took the position that the City Collector's account did not come within the protection of the escrow agreement and refused payment of the restricted part (over five per cent) amounting to $33,454.80. The City contended that the collector's account was always within the protection of the escrow agreement and refused, after receiving the payments in July, 1934, to release to the Bank (or to the Finance Commissioner later in charge of its liquidation) the remaining bonds of an aggregate value of more than $35,000. By stipulation between the City and the West End Bank, the First National Bank, the escrow agent, sold the bonds and then filed the interpleader suit paying the proceeds of the bonds, $35,330.60, into court. At the commencement of the trial, it being shown that the Bank would pay a fifty per cent dividend, a stipulation was entered into, and adopted by the court by an order, directing that one-half of the collector's account be paid to him out of the fund in the custody of the court. $16,727.04 was paid thereon, leaving the disposition of a like amount subject to be determined by this litigation.

 We do not see how the depository escrow agreement can be construed to cover the collector's account. It was not so construed by the parties prior to the Bank closings and restrictions of 1933, because it was not considered in fixing the amount of bonds kept on deposit to secure the funds specified thereby; and "the interpretation put upon a contract by the parties themselves, as shown by their conduct in regard to it, is always persuasive in determining its true meaning." [Thomas v. Utilities Bldg. Corp., 335 Mo. 900, 74 S. W. (2d) 578.] The ordinance, approving the 1932-33 escrow agreement and designating the Bank as the depository for that year, directed that "the City Treasurer shall deposit all funds of said City with the West End Bank pursuant to the contract entered into," but did not mention the collector. By its express terms, this agreement covered only "funds that are deposited (with the Bank) by the Treasurer of the City" ("as such treasurer") and "all funds deposited in the name or to the credit of said city." Clearly this meant funds in the treasurer's account or other funds appropriated out of the City Treasury to City officers and held by them for the City purpose designated. The account of the collector in this case not only had never been in the City treasury, and was not "deposited in the name or to the credit of said city" when the escrow agreement was made, but it also contained money that the collector was entitled to keep for his own expenses and compensation, as well as funds that would ultimately go into the City treasury. Until he settled with the City, it was in the sole custody of the collector and he was, under the statutes relating to cities of the fourth class, entitled to keep it where he saw fit; he and his bondsmen being liable as insurers

for failure to account therefor and pay over at the proper time. [City of Fayette v. Silvey (Mo. App.), 290 S. W. 1019.] The City depository statute (Sec. 7010, R. S. 1929) does not mention the City collector nor prevent him from selecting his own depository. His collections were trust funds in the collector's hands, but until they were paid over to the City Treasurer, they did not come within the designation, made in the escrow agreement, of the funds thereby secured.

It is said, in the City's brief, that "either the depository agreement expressly includes the funds deposited by the Collector, or, if it does not, then the Bank became possessed of the funds illegally and the City is entitled to a preference." However, it has been expressly held that deposit of tax collections, in a bank by a city collector, whether it be the city depository or not, does not give the city the right to a preferred claim either on the theory of illegal deposit or special deposit. [City of Fulton v. Home Trust Co., 336 Mo. 239, 78 S. W. (2d) 445; see, also, In re Home Trust Co. of Fulton (Mo. App.), 69 S. W. (2d) 312; In re Citizens Bank of Senath (Mo. App.), 102 S. W. (2d) 830.] In City of Fulton v. Home Trust Co., supra, a case arising under similar statutes applicable to cities of the third class, this court said:

"Neither by statute nor ordinance is he required, upon making a collection of city taxes or other city revenues, to forthwith pay over or transfer each individual item to the city treasurer and take a receipt therefor, but he is authorized and permitted, if not in fact directed, to retain the various sums so collected during the month until the end of the month, at which time he is required to make his monthly settlement and pay over to the city treasurer the total amount of such collections made during the month and take receipts therefor one of which he files with the city clerk. Clearly during such period he is the lawful custodian of such funds. Neither statute nor ordinance directs how or what manner he shall hold or preserve the funds while same are in his custody. He is responsible for their safekeeping and under a bond conditioned that he will pay them over to the city treasurer monthly as required by statute and ordinance. . . . He was the legal custodian of these funds and certainly was authorized and warranted in depositing them, from time to time during the month, as received, in a bank for safe-keeping, if he chose to do so, and his act in so doing was not in violation or contravention of any statute or ordinance. It was not therefore an illegal or unlawful deposit giving rise to a trust *ex maleficio*. . . . 'Such deposits (of public funds), in the absence of statute, stands upon the same plane as other general deposits, and a claim therefor is not entitled to preference.' . . . 'The bank simply became indebted (to the collector) in his official capacity, and he took the risk of being able to collect it when he required it.' "

844

■ Respondents also claim estoppel because of the resolution instructing the collector to deposit all moneys received by him in the West End Bank and the conduct of the Bank officers in procuring it. Even if it did cause the collector to decide to make this Bank his depository, this resolution was the action of the legislative body authorized to speak for the City. Certainly if the City brought about this situation (deposits in this Bank instead of the one originally chosen by the collector), it cannot claim any advantage (not given by its contract) against general creditors of the Bank because of such situation. Why should the collector be given a preferred status because of it? The resolution and conduct concerning it occurred many years before the escrow agreement, construed herein, was made. Therefore, the collector could not have relied upon this escrow agreement at that time. When this agreement was made it did not mention the collector's account and there never was an escrow agreement that did mention it. However, neither the collector nor anyone representing any party hereto ever claimed prior to 1933 that bonds should be deposited in sufficient amounts to secure it. Certainly, there is no evidence that the Bank, prior to 1933, represented to the collector that there were bonds in such amounts in escrow, or made any false statements concerning the amounts actually there, or misrepresented the contents of any escrow agreement. Certainly also, the collector had plenty of time, between 1925 and 1932, to investigate and determine his rights and duties with respect to the money he collected.

■ Furthermore, it would seem to be unjust to general creditors of the Bank to pay this collector's account in full. The bonds, from which the funds in controversy was derived, were not purchased with the money deposited by the collector. All the money he deposited after March, 1933, was paid to him. It was only after this deposit and others were restricted in 1933, when a new mayor of the City insisted upon the purchase of additional bonds that the total amount of bonds in escrow ever was made equal to the total sum of the City's various accounts together with the collector's account. This additional amount was agreed to be put in escrow (without a new depository agreement) in August, 1933, to prevent the City from taking all of its accounts to another bank, which it could have done by demanding sale of the bonds put in escrow before the Bank was restricted. These additional bonds, placed in escrow at that time, could only have been purchased then out of the general funds of the Bank (a bank kept on a restricted basis by the Finance Commissioner) to which all existing general depositors had a right to look for the payment of their claims. [In re Mt. Vernon Bank, 334 Mo. 549, 66 S. W. (2d) 850.] The purpose of the 1933 Bank Restriction Act (Laws 1933, p. 402) was to preserve the *status quo* with reference to assets "for the protection of depositors and other creditors" then

existing, and to authorize subsequent business only on the basis of providing for its own liquidation (by keeping new deposits in designated liquid investments) separate from transactions prior to restrictions. When the City did withdraw its funds, in 1934, because the Bank could not continue to keep sufficient bonds in escrow to meet its new demands, the City refused to release all bonds then in escrow upon sale of enough bonds to make payment of all accounts except that of the collector. This accounts for the excess left in escrow, equal to the amount of the collector's account. Since this excess amount of bonds was purchased after the Bank was restricted (with funds not invested to protect subsequent business) it is only equitable that the proceeds thereof be applied to the payment of all depositors in proportion to their claims.

The decree entered in each case is reversed and the causes remanded with directions to enter decree in accordance with the views herein expressed. *Bradley, C.,* concurs; *Dalton, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.