GREENE COUNTY BUILDING AND LOAN ASSOCIATION, A CORPORATION, RESPONDENT, v. MILNER HOTELS, INCORPORATED, A CORPORATION, APPELLANT.—227 SW (2) 111.

Springfield Court of Appeals.  January 18, 1950.

*Farrington & Curtis, Richard Farrington* and *Jack S. Curtis* for appellant.

1052

*Miller & Fairman, J. Weston Miller, Wm. P. Sanford, Perry A. Ennis* and *George M. Flanigan* for respondent.

McDOWELL, J.—This is an action for rent alleged to be due under a written lease. The suit was brought in the Circuit Court of Greene County, Missouri, Division No. Two, tried before the court, resulting in a judgment in favor of plaintiff in the sum of $1518.71, from which judgment both plaintiff and defendant have appealed to this court, being cases No. 6851 and 6853, which appeals are considered together in this opinion.

We will refer to the Greene County Building and Loan Association, a corporation, who filed the petition below, as plaintiff, in this opinion and to the Milner Hotels, Incorporated, as defendant.

Plaintiff's amended petition states that on May 3rd, 1938, it became the owner of and was entitled to the rents due under a written lease entered into on the 15th day of April, 1936, between the Greene Tavern, a corporation, and the Milner Hotels, Incorporated, and that, under the terms of said lease, from May 3rd, 1938 to September 1st, 1944, the unpaid rent due plaintiff from defendant is $2,338.21, with

accrued interest amounting to $650.85, making a total sum due plaintiff of $2,989.06, for which amount plaintiff prays judgment.

Defendant's amended answer to plaintiff's amended petition denies that it is indebted to plaintiff in any sum and pleads that it has paid to plaintiff all rents due under the terms and provisions of the lease. Defendant's amended answer further pleads that it rendered to plaintiff statements of the gross rents due under the lease each month during the lease period; that plaintiff accepted the statements and the rents without objection which constituted a settlement in full with the defendant.

In this appeal defendant, under points and authorities, complains

1. That the trial court erred in construing the term "gross receipts" used in the lease to include more than "gross receipts" from room rent only and in refusing to give defendant's Declaration of Law No. 2. The defendant complains under this point that the lease in question was ambiguous; that the court must determine the mutual intention of the parties and, in ascertaining such intention, the court should consider the surrounding facts and circumstances; defendant contends that the parties to this lease have, by their conduct, construed the lease, which construction should be given great weight by the court.

Under point 2, defendant contends that plaintiff is estopped to assert its claim in this case because of the fact that it accepted monthly statements throughout the entire lease period without objection and payments of the rent thereunder.

Under point 3, defendant complains that the trial court erred in refusing defendant's offer to show by parol testimony the interpretation the parties, themselves, placed upon the term "gross receipts" as used in the lease.

Under point 4, defendant complains that plaintiff failed to sustain the burden of proof under any construction of the term "gross receipts" as to items of "Milner Laundry", "Advance to Guests Returned", and "Miscellaneous, receipts, and that the court erred in giving plaintiff a judgment based thereon.

Under point 5, defendant complains the court erred in including payments for heat furnished on a cost basis.

Under point 6, defendant complains that the court erred in including receipts for "Milner Laundry" and "Advance to Guest Returned" as part of gross receipts and in refusing its Declaration of Law No. 3

Plaintiff, in its appeal, assigns two grounds of error.

First, the trial court erred in disallowing the amounts received and collected by defendant as telephone charges as a part of "gross receipts."

Second, where plaintiff showed the telephone charges were charged and collected by defendant, the burden of proof was on the defendant to show that it was merely a collecting agent as to some definite part

of these charges in order to free itself from paying a percentage rent on the total.

Plaintiff's reply. brief to defendant's assignments of error are merely denials of defendant's contention under its appeal.

. We here set out such facts as we believe are necessary to a proper decision of the issues in this case.

. The lease sued upon is as follows:

"LEASE

. "THIS AGREEMENT made and entered into this 15th day of April, 1936, by and between the Greene Tavern, a corporation with its principal office in Springfield, Missouri, party of the first part, hereinafter referred to as Lessor, and the Milner Hotels, Incorporated, of Detroit, Michigan, party of the second part, hereinafter referred to as Lessee.

. "WITNESSETH, that the party of the first part as Lessor is owner of all the furniture and equipment, including curtains, draperies, rugs, linens, mattresses and bedding now situated in the lobby of the Greene Tavern Hotel, and the second, third and fourth floors thereof, and it is holder of a lease of said portion of the Greene Tavern Hotel Building, located at 412-14-16-18-20 East Commercial Street, Springfield, Missouri, more particularly described as follows:

"'All of Lots numbered Fifteen (15), Sixteen (16), Seventeen (17), and Eighteen (18) in Block Twenty-Eight (28) of the original plat of North Springfield now a part of the City of Springfield, Missouri.'

"with right of sub-leasing any or all portions thereof, does hereby let and lease to the party of the second part, as Lessee, the hotel lobby, the second, third and fourth floors of the said Greene Tavern Hotel building, and the portions of the basement containing lavatories and engine room, as now used in connection with said hotel operation. Also, all furniture and equipment therein, including pillows, mattresses, blankets, spreads, linens, curtains, draperies and rugs, together with house cleaning equipment and janitor supplies, all of which equipment is duly itemized and attached hereto as Exhibit "A", being a part of this lease, for and in consideration of a rental for a period of five (5) years from the first day of May, 1936, expiring on the thirtieth day of April, 1941, at twenty per cent (20%) of the gross receipts, with a minimum total of Thirty Thousand Dollars ($30,000.00); said rental to be paid on the first of each month for the current month, with a minimum of Five Hundred Dollars ($500.00), and at the close of each month, twenty per cent (20%) of the gross receipts shall be determined and filed with the lessor by the Manager for the Lessee, and should twenty per cent (20%) of the gross receipts exceed the Five Hundred Dollars ($500.00) paid at the beginning of the month, the difference thereof shall be payable at the time of filing the gross receipts for the month, and all payments to be

made at the lessor's office,—East Commercial Street, Springfield, Missouri, or at such other place as lessor shall designate.

"IT IS FURTHER AGREED between lessor and lessee that before *lessee* takes possession of said premises, they will pay to the lessor One Thousand Dollars ($1,000.00), representing the minimum rental payment for the months of May, A. D. 1936, and April, A. D., 1941, which payment for April, A. D., 1941, is made in advance for the faithful performance of said lease, and to be forfeited to lessor in case of default on the part of the lessee in carrying out terms of said lease, and IT IS FURTHER AGREED that lease is made on the further condition that in case default shall be made by the lessee in the payment of rent or any part thereof, within ten (10) days after due notice of the amount of rent due has been mailed by the lessor to lessee, or in the performance of any of the covenants, agreements and conditions of said lease, then this lease is henceforth, at the option of the lessor, null and void, and the lessor may re-enter without notice or demand, and the lessee shall be liable for all loss or damage resulting from such default or violation, and it is hereby understood, and the lessee hereby covenants with the lessor, that such annulment or voidance or re-entry shall not release the lessee from the obligation to make the minimum monthly payments hereinbefore reserved as rental, at the times and in the manner aforesaid, and the lessor may re-let the said premises as agent of the lessee in name of Milner Hotel Company, Inc., applying the proceeds thereof first to the payment of such expenses as it may be put to in re-renting, and then to the payment of said rents as the same from time to time become due, and towards the fulfillment of other covenants and agreements of the lease herein contained, and the balance, if any, to be paid over to the said lessee and the lessee hereby covenants and agrees that if the lessor shall recover or take possession of the said premises, as aforesaid, and be unable to re-let the same or obtain sufficient rent therefor, to make up the amount of rent hereby reserved, the lessee shall and will pay to the lessor any and all loss or difference of rent for the residue of the term.

"The lessee covenants and agrees that it will, at its own expense, keep the interior of said building and improvements, including the screens, in good repair and condition, clean and free from filth and waste, and at all times keep said premises in a sanitary condition as required by the ordinances of the City of Springfield, Missouri, and shall not keep, permit or maintain any nuisance therein or thereabout, and shall comply with all the federal and state laws and city ordinances and regulations regulating said premises; that the lessor agrees to take care of the exterior of said building, and the roof thereon.

"The *lessee* shall pay for all lights, heat and water used or consumed by lessee or the guests or employees of lessee at said premises, and

shall at all times take good care of the furniture and equipment in said building, and any damage to such shall be replaced at the cost of the lessee in the same quality of goods "destroyed or damaged.

"The lessee and lessor hereby covenant and agree that heat necessarily furnished the coffee shop and dining room shall be furnished by the lessee, for which they are to receive a monthly income of $28.00 per month from lessee of said coffee shop, kitchen and private dining room for the months of September to April, inclusive each year.

"The lessee and lessor hereby covenant and agree that heat necessarily furnished the east portion of the ground floor of the hotel building, being space now occupied by the Greene County- Building and Loan Association, shall be furnished by the lessee for which they are to receive a monthly income of $26.00 per month from the lessee of that said portion of the building, for the months of September to April, inclusive, each year.

"The lessor and lessee hereby covenant and agree that during the terms of this lease the lessee shall pay the insurance premium on policy of insurance carried upon the furniture and equipment, liability insurance and workmen's compensation, necessary to protect the lessor for any damages that may be done through hazards creating liability upon the part of the lessor.

"IT IS FURTHER UNDERSTOOD AND AGREED that in the event the said lessee shall be declared bankrupt or if a receiver shall be appointed for the lessee's property or affairs or any assignment made for the benefit of lessee's creditors, then, in any such event, this lease shall thereupon terminate and end and lessor shall have the right to re-enter upon and take possession of said premises within one (1) day thereafter, without demand or notice, and any Trustee, Receiver, or Assignee shall have no rights or privileges hereunder.

"It is further agreed by the lessor and lessee that this lease may be extended, in its entirety, for a period of five (5) years from the date of the expiration of this lease, on the same terms and basis, provided the lessee serves written notice upon the lessor ninety (90) days before the termination of this lease, and at the termination of this lease, or the extension thereof, any differences arising between the parties hereto contracting relative to inventories shall be adjusted upon the items short or long, with regard to the value of replacement in the same quality with respect to the original "date of this lease. * * * .''

For a period of seventy six months, dating from May 3rd, 1938, to August 31st, 1944, plaintiff, assignee of the lease, was the lessor and defendant the lessee of a part of a four-story building on Commercial Street in Springfield, Missouri. The part of the building leased was the second, third and fourth floors, which were divided

into hotel rooms; the hotel lobby on the first floor, the lavatory and heating plant in the .basement. The space not covered by the lease was the office of plaintiff, Building and Loan Association, and a restaurant with kitchen and private dining room on the ground floor. The entire building was heated by a single heating plant.

The evidence shows the leased premises were to be used in the operation of a hotel; that defendant paid the minimum monthly payments of $500.00 promptly as provided in the lease and rendered to plaintiff monthly statements of the gross receipts, provided under the lease, of which the following is typical:

"Sept. 10, 1944

Springfield

"Milner Hotel

| "Room rent | $3020.23 |
| Refunds | 10.98 |
| - | $3009.25 |
|  | 2500.00 |
|  | $ 509.25 @ 20% $101.85." |

Whenever the "gross receipts" of room rents exceeded $2500.00, twenty per cent of the excess was promptly paid. These statements of "gross receipts" were furnished plaintiff by defendant on the tenth day of each month, during the lease period. The evidence shows that the statements of "gross receipts" showed an excess of amount of rents due plaintiff, on eight different. months of said rent period, which amounts were paid by check each month and the same was accepted by plaintiff without objection.

The first complaint made by plaintiff against the defendant for unpaid rents was the filing of this action.

The evidence shows that the Greene County Building and Loan Association was located on 418 East Commercial Street, next door to the Milner Hotel and that the office of plaintiff was only fifty feet from the office of the defendant during the entire lease period. The evidence shows plaintiff's officers made two inspections of the hotel during the lease period, was in the hotel during the lease period at different times, knew defendant was furnishing laundry service to its guests but never used the telephone nor did the evidence show plaintiff knew defendant was selling soft drinks.

The testimony of plaintiff shows that it accepted defendant's reports of the "gross receipts" monthly, as required under the lease, cashed the checks for excess payment and had no reason to question the statements during the lease period until shortly before it sold the hotel, to-wit, September 1st, 1944.

Plaintiff's vice-president testified that, after the lease expired and the property turned over to the new owner, B. & C. Investment

Company, he was shown the books of the defendant by one Mr. Sauer, the manager of the B. & C. Investment Company. The witness testified that this was the first opportunity plaintiff had to check the books and receipts of the Milner Hotel.

The evidence shows that defendant kept its books on a cash-book basis and, at the close of each month's business, made a report to its home office in Detroit, on a standard monthly form, which merely had the record of the cash book copied into it, showing each day's figures and the entire hotel business for the month. Defendant's witness testified that the cash book record was broken down into a number of items; that under the receipts from "Advances to Guests" was shown money paid by the defendant for accommodation of guests, which was, at a later date, returned to it; that under the heading "Telephone Receipts", was kept collections from guests who used telephone service in the hotel and paid defendant at the time the guests paid their hotel bill; that the "Tax" column shown on the cash book was sales tax collected on room rent from the guests; that under "Miscellaneous" receipts was kept money paid defendant for heat furnished plaintiff for unrented part of building, money received from Coca-Cola and Dr. Pepper sales and money paid by guests for sending Western Union Telegrams.

Under "Advances to Guests Returned", as shown by defendant's cash book No. 10, the witness testified that this covered few items. It covered laundry, belonging to guests, left at the desk or picked up at his room and sent out to have laundried for him. The witness testified this service included tailoring of guest's clothes and, in some instances, telegrams sent for benefit of guests and charged to their account, and it included, also, medicine gotten for guests and charged to their account. The witness testified, also, it included dry cleaning service rendered to guests; that under this item was also included refunds to guests. The refunds were money collected by defendant from its guests in advance and refunded when the guests did not use up all their time. The witness testified that under soft drinks sold, defendant paid eighty cents a case and charged the guests five cents a bottle and that, after the cost of handling and icing the drinks was paid, together with losses sustained for broken bottles, lost bottles and cases, there was very little profit.

The witness also testified that under the item, "M Laundry", there were two kinds of laundry service rendered to guests. First, under "Flat Work Laundry" was included bundles or kinds of wet-wash for guests and under item, "Advance to Guests" was where the defendant sent out special laundry.

Plaintiff introduced exhibit 4, being a photostat of pages 116 and 117 of defendant's original cash book for the month of July, 1944, for the purpose of showing defendant's method of keeping

books and the manner in which they entered various items thereof. Plaintiff offered exhibit 5, being a photostat of page 151, to show how defendant kept the last day of the month entries. Exhibit 4 shows the business done for the day under different items, to-wit: Room Rent, M. Laundry, Phone, Advance to Guests, Tax and Misc. On one side of the ledger shows receipts and on the opposite side of the ledger shows pay-outs under the same items. Exhibit 5 gives the month's totals of the sums received under each item for the month of August, 1944. These exhibits, in no way, prove plaintiff's cause of action but show defendant's manner of bookkeeping. Plaintiff's exhibit 6 is a consolidated summary of the amount of cash received by defendant under items "Room Rent", "Phone", "Mln Laundry", "Advance Returned", "Sales Tax" and "Miscellaneous" for the twenty nine months in question and, on the opposite side of said exhibit, plaintiff has figured the amount it claims is due it for unpaid rents from the defendant for each of said months. Plaintiff's exhibit 7 covers the twenty nine months of said lease term, which plaintiff contends it is entitled to unpaid rents. This exhibit shows under "Gross Receipts", "Milner Laundry", a total of $3539.85, and under "Advance" $5826.53, making a total of $9366.38, and, under "Pay-Outs", "Advance" $4028.42, "Flat Work Laundry", $3957.79, making a total of $7986.21. This exhibit shows that plaintiff received $1380.17 more from guests than it paid out. The exhibit further discloses that the total amount collected under "Advances" was $5826.53 and that the total paid out under "Advances" was $4028.42, showing that defendant received $1798.11 more under item "Advances" than paid out.

The court asked the plaintiff's witness this question:

"Q. What do you understand that item "Advances to Guests", whether it is paid out or received, means? Does it mean the hotel has loaned the guest some money and the guest then has paid it back, or what does it mean? A. I don't know."

The evidence shows that not all of the bills were paid by the hotel in Springfield. A part of the laundry cost and a part of the telephone bills were paid out of the Detroit office and are not shown on the cash book kept by defendant in Springfield.

The evidence, nowhere in the record, discloses how much profit or commissions defendant received from its guests under item "Milner Laundry" or under "Advance to Guests" and there is no way for the court to determine what part of these items were paid out as accommodations to guests and what part was received by the hotel for its services.

Under item designated "Telephone", the facts show that the telephone company placed a switch board in defendant's office and a telephone in each room for the use of guests; that defendant paid a flat rate to the telephone company and received a certain number

of free calls (the number of free calls is not disclosed) and that the defendant paid three cents for each additional local call. The defendant charged the guests the exact charge on all long distance calls made which were intrastate and on the long distance calls which were interstate, defendant received a commission of fifteen per cent. Guests were charged five cents a call for local calls. The cash books of the defendant show that they collected from guests for telephone service, $2716.11, and paid out $5471.44. The evidence does not show how much the guests paid in for long distance calls, intrastate or what part of the calls were local or interstate calls. There is no way to determine from the testimony offered what commissions defendant earned which were paid by guests under item "Telephone."

Under item, "Miscellaneous" the evidence shows that the books show cash received for rents paid under the terms of the lease for heat furnished plaintiff, monies received for soft drinks sold by the defendant, telegrams sent through Western Union for guests, the total amount of cash received during the months in question, under this item, was $1916.00. The evidence does not disclose what part of the cash received under this item was for soft drinks sold nor does it disclose what part of the cash was for telegrams sent for guests nor commissions received by the defendant for sending such telegrams.

Under item, "Sales Tax", the evidence shows that defendant collected two per cent sales tax as required under R. S. Mo. 1939, Sec. 11431. Said section reads as follows:

"From every remittance to the State Auditor made on or before the date when the same becomes due, the person required to remit the same shall be entitled to deduct and retain an amount equal to three per cent thereof."

The evidence does not disclose whether or not defendant paid the sales tax to the state as required under this law so as to enable it to deduct three per cent for collection.

The evidence shows that defendant made certain refunds to its guests for overpayment on room rent or unused portion of room period paid for and the sales tax collected on such amounts. We will more fully discuss these items in our opinion.

The defendant's first assignment of error complains that the court erred in construing the term "gross receipts" as used in this lease to include more than "gross receipts" from room rent only and in refusing to give its Declaration of Law No. 2.

Defendant's Declaration of Law No. 2 requested the court to declare the law to be that the term "gross receipts" as used in the lease in this case means all monies received by defendant as lessee upon the items of personal and real property covered by the terms of the lease and, therefore, only receipts from rental of

rooms, less refunds, could be considered as "gross receipts" for the purpose of determining the amount of rent payable to plaintiff.

Defendant's first contention under this assignment of error is that the lease is ambiguous and it cites, in support of this contention, Paisley v. Lucas (Mo. Sup.) 346 Mo. 827, 143 S. W. 2d 262, l. c. 267.

In this case, which was an action to recover bonuses alleged to be due under an insurance agency contract and damages for breach of said contract, the contract provided that plaintiff should have the exclusive right to write insurance for defendant company in certain territory and certain territory was agreed to be open territory. The court held that the contract was ambiguous because the terms "open territory" as applied to insurance were susceptible of different constructions. The court, on page 267, defines an ambiguous contract thus,

"A contract is ambiguous when its terms are reasonably susceptible of different constructions. (Webb-Kunze Construction Company v. Gilsonite Construction Company, 281 Mo. 629, 220 S. W. 857, 860.)"

The question the court had to decide was whether or not, under the contract, appellant was entitled to all of the commissions on policies issued in both the "open" and "exclusive" territory.

We agree with the law as laid down in this case but we hold that it is not applicable because, taking the contract as a whole, in the case at bar, it is not ambiguous. State v. Allen, 301 Mo. 631, 256 S. W. 737, 739.

The term "gross receipts" as used in the lease, under consideration, has a definite meaning and is used in its plain and ordinary and usual sense. "Gross receipts" means the whole or entire receipts received, the total as opposed to the net. The entire earnings, without deduction. State v. Hallenberg-Wagner Motor Co., 341 Mo. 771, 108 S. W. 2d 398, 401. In this case the court defines "gross" to mean the whole, entire, total, uncompromisingly express the aggregate of the parts, undiminished and intact. The term "gross receipts" as used in the lease before us for consideration, means the gross earnings of the hotel operated under the lease without any deductions.

Defendant's second contention under this assignment of error is that, in the construction of the lease, the court must ascertain and give effect to the mutual intention of the parties, giving greater regard to their clear intent than any particular words which may have been used to express their intent.

In 51 C. J. S. 850, the following law is declared:

"The object in construing a lease is to ascertain and give effect, if possible, to the mutual intention of the parties, without regard to the refinements of technical distinctions, insofar as such construction may be made without the contravention of legal principles. * * *.

"The intention of the parties is to be ascertained from the language employed in the lease, in connection with the subject matter and the surrounding circumstances, * * *. Greater regard is to be had to the clear intention of the parties than to any particular words which they may have used in the expression of their intention.

" * * * It is not the province of the court, by construction, to change or make a new contract for the parties to a lease, or to supply material stipulations or conditions, or to create terms or conditions which contravene the agreements of the parties."

In Ritchie v. State Board of Agriculture, 219 Mo. App., 90, 266 S. W. 492, 494, the court, in construing a lease, stated the law thus,

"The object in construing a lease is to ascertain and give effect to the intention of the parties, without regard to the refinements of technical distinctions, insofar as that may be done without contravention of legal principles. The intention of the parties is to be gathered from the words which have been employed in connection with the subject-matter, the object and purpose of the lease, and the surrounding circumstances. Such intention is to be gathered from the whole instrument rather than "from a single clause thereof. Greater regard is to be had to the clear intention of the parties than to any particular words which they may have used in the expression of their intention. A lease must be construed with reference to the intention of the parties at the time it is made."

The court, in this case, was construing a farm lease which restricted the use of the lands to certain crops and gave to the lessee the right to sub-lease and did not limit the purposes for which the land might be sub-let.

The defendant, a sub-lessee, over the objection of plaintiff, undertook to use the land for state fair purposes and the plaintiff brought suit for damages for trespass. The court held that the plain intention of the parties, from the reading of the lease, was that the land was to be used for agricultural purposes and that the sub-lessee was liable.

In Ambassador Bldg. Corp. v. St. Louis Ambassador Theatre, (Mo. App.) 185 S. W. 2d 827, the trial court was called upon to interpret a lease. The suit was for declaratory judgment to have the court declare the rights and obligations of the parties under the lease. This lease provided that the lessee pay as rent fifteen per cent of the weekly gross cash receipts from the operation of the demised premises, but the minimum weekly rental to be $2350.00 for the first two years of the lease and $2550.00 for the next succeeding three years, $2850.00 for the next succeeding three years and $3050.00 for the final two years, except the period in each year beginning May 15th and ending August 15th, which periods

the minimum weekly rental was to be $2350.00. This case is almost exactly like the case under consideration.

In discussing the law, the court says:

"(1). We are unable to agree with plaintiff's contentions. We think such contentions ignore the peculiar situation of the parties and their mutual intentions as evidenced by the complicated provisions they made in paragraphs 7 and 8 of the supplemental agreement, as well as their operations and conduct in carrying out the lease and supplemental agreement for a period of more than six years before this controversy arose. In 13 Corpus Juris, Sec. 482, p. 521, it is said: 'The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles. Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent.' * * * See also, 17 C. J. S. Contracts, Sec. 295a, p. 689."

We again quote from this opinion, l. c. 836:

"(2, 3) It is clearly evident from the language of paragraph 8 that the lessor and lessee had a very definite intention to do considerably more than merely to make a lease between themselves. It is the duty of the court to ascertain such intention and give it effect. The modern rule on this question is stated in Wigmore on Evidence, 3d Ed., Section 2470, page 227, as follows: 'Once freed from the primitive formalism which views the document as a self-contained and self-operative formula, we can fully appreciate the modern principle that the words of a document are never anything but indices to extrinsic things, and that therefore all the circumstances must be considered which go to make clear the sense of the words,—that is, their association with things.' * * * ."

The court, in this opinion, quotes from 12 Am. Jur., Contracts, Sec. 227, pages 745 and 748, as follows:

" 'Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. * * * In other words, the object to be attained in interpreting a contract is to ascertain the meaning and intent of the parties as expressed in the language used.' "

The court, in this case, quotes from Paisley v. Lucas, 346 Mo. 827, 839, 143 S. W. 2d 262, 268, the following:

" 'For the purpose of determining the intention of the parties and reaching a construction that is fair and reasonable under all the facts and circumstances, the court may consider the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding facts and circumstances attending the execution of the contract and its interpretation by the parties.' "

In Velvet Freeze, Inc. v. Milk Wagon Drivers', et al., (Mo. App.) 177 S. W. 2d 644, a suit was filed for declaratory judgment to interpret a contract made between the parties. There was no dispute concerning the execution and terms of the contract. The question arose over the meaning of the language in Article 13:

" 'In addition to above stated salaries, Ice Cream Drivers, during the life of this Contract, shall receive the following commission, same to be based on days route is operated rather than on days in the month:

" '(a)    Three (3) cents per gallon on all ice cream and ice cream products, except eskimo pies, popsicles, and fancy-form or molded ice cream, sold and delivered in excess of one hundred (100) gallons per day.

" '(b)    One (1) cent per dozen, starting from scratch on all popsicles, chocolate eclairs, eskimo pies, drumsticks and Cones-O-Plenty (chocolate-dipped cone with crushed peanuts on top).

" '(c)    Five (5) per cent on dollar, from scratch, on all products sold and delivered other than ice cream, ice cream novelties and ice cream confections.' "

It was the contention of appellant that the drivers were entitled under Article 13 only to commissions on sales made by themselves. Respondent takes the position that they are entitled to commissions on sales where they make deliveries regardless of who made the sales.

The court, in passing upon this case, uses the following language:

"In determining the meaning of a contract, especially where there is a want of clearness in the language used, it is always permissible for the court to consider the situation of the parties and the accompanying circumstances at the time of the execution of the contract. * * *

" * * * * *

"e.    The court in interpreting words or other acts of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement.

" * * * * *

"From all the facts and circumstances surrounding the execution of the contract, we are convinced of the correctness of the trial court's ruling. This is also in accord with the construction placed upon the contract by the parties themselves. Immediately after the execution of the contract appellant began paying commissions to the drivers on sales made by the company's executives, and this practice

has continued without interuption to the date of the trial. Ordinarily, unless there is some rule of law positively forbidding it or precluding its adoption, the courts will follow the interpretation placed upon the contract by the parties themselves as shown by their acts and conduct. Coleman v. Ford Motor Co., 195 Mo. App. 554, 193 S. W. 866; * * *.''

In Wentzel v. Lake Lotawana Development Co., 48 S. W. 2d 185, the court declares the law to be where the parties themselves have put a construction upon the provision of a contract the court will accept the construction unless contrary to the obvious intendment of the contract.

The same law is laid down in First National Bank v. West End Bank, 344 Mo. 834, 129 S. W. 2d 879. In this case the Supreme Court said:

''The interpretation put on a contract by the parties themselves, as shown by their conduct in regard to it, is always persuasive in determining its true meaning.''

In Thomas v. Utilities Bldg. Corporation, 74 S. W. 2d 578, 582, the Supreme Court stated the law thus:

''The interpretation put upon a contract by the parties themselves, as shown by their conduct in regard to it, is always persuasive in determining its true meaning.''

In John Deere Plow Co. v. Cooper, (Mo. App.) 91 S. W. 2d 145, 148, the court states the law to be,

''The construction which parties themselves place upon an existing contract is entitled to great weight in arriving at the proper interpretation of the same.''

In determining the rights of the parties under the lease in question, it becomes the duty of this court to determine the mutual intent of the parties from the language used in the lease in its plain and ordinary sense in connection with the subject matter and the surrounding circumstances giving greater regard to the clear intention of the parties than particular words which they may have used in the expression of their intention. It is not the province of the court by construction to make a new contract for the parties to the lease or to supply any material stipulations or conditions which contravene the agreements of the parties. Therefore, we will determine the intention of the parties from the words which have been employed in connection with the subject matter, the object and purpose of the lease and the surrounding circumstances. In determining this intention we will consider the instrument as a whole and not from a single clause thereof, as well as the conduct of the parties themselves in carrying out the terms of the lease. We must determine the meaning and intent of the parties as expressed in the language used and reach a construction that is fair and reasonable under all the facts and circumstances, considering the

relationship of the parties, the subject matter of the contract, the business and circumstances attending the execution of the contract and its interpretation by the parties.

We hold that under the lease the lessor leased to the defendant a part of a four-story building for the purpose of operating a hotel. The lease covered the second, third and fourth floors of said building, which were divided into hotel rooms, the hotel lobby on the first floor and the lavatory and heating plant in the basement, together with all furniture and equipment therein, including pillows, mattresses, blankets, spreads, linens, curtains, draperies and rugs, with house cleaning equipment and janitor supplies. The term of the lease was to extend from May 1st 1938, to April 30th, 1941, with a right of renewal for five additional years, which right defendant exercised. The rent reserved in the lease was twenty per cent of the "gross receipts", with a minimum annual total of $30,000.00, said rent to be paid on the first of each month for the current month, with a minimum of $500.00 and, at the close of each month, twenty per cent of the gross receipts, to be determined and filed with the lessor by the manager for the lessee and should twenty per cent of the gross receipts exceed $500.00, paid at the beginning of the month, the difference to be payable at the time of the filing of the gross receipts for the month. All payments are to be made at lessor's office, East Commercial Street, Springfield, Missouri, or as designated by lessor.

Under the terms of this lease, in case of default in payment of rent or any part thereof by lessee, lessor, after ten days notice, to lessee, of the amount due for rent or in the performance of any of the covenants contained in the lease, had the option to terminate the lease and declare it null and void, and was given the right to re-enter without notice or demand and hold lessee liable for all loss or damage resulting from such default or violation. The lease contains other rights, on the part of the lessor, in case of default in payments of rent by lessee of which we deem unnecessary to set out here for the purpose of determining the meaning of the lease.

This lease has a provision which requires lessee to pay for all lights, heat and water used by said lessee in operating the premises.

Then under the terms of the lease, the lessor covenants and agrees to pay lessee $28.00 a month for heat furnished the coffee shop and dining room, retained by lessor, for the months of September to April, inclusive, each year, and the lease further provides that lessor is to pay lessee $26.00 per month for heat furnished that portion of the ground floor of the hotel building occupied by plaintiff, Greene County Building and Loan Association, from September to April of each year.

Under the lease the lessee is given the right to renew or extend the lease terms for five years, upon giving ninety days notice.

The issues raised in this appeal must be determined by the meaning of the term "gross receipts" as used in the lease.

Plaintiff contends that the term "gross receipts" should be construed to apply to every cent collected by defendant in the operation of said hotel business, including room rent, telephone service, laundry service, advance returns to guests, sales tax, and miscellaneous collections.

The defendant contends that the term "gross receipts" as used in the contract shall be, by the court, construed to mean "gross receipts" from room rent only.

We believe that most of the issues in the case can be decided under the facts in the case.

First, there is no dispute as to the item of "gross receipts" for room rent. It is admitted by the parties that defendant paid to plaintiff the gross receipts of all room rents collected in the time and manner as provided in the lease. There might be some contention as to the return to guests of certain advances for unused room rent and sales tax, but we will decide that point later in this opinion.

Under the item of telephone, the plaintiff seeks to charge defendant with the sums collected as shown in the defendant's cash book under the theory that it is a part of the "gross receipts."

We agree with the trial court that plaintiff's evidence was insufficient to warrant a recovery under this item.

The facts show that defendant had the telephone company put in a switch board in the office of the hotel and telephones in each room for the accommodation of guests; that the telephone company was paid, for this service, a flat rate of so much and defendant was given, free, so many local calls (the exact number the testimony does not show); that the defendant charged guests for telephone service on local calls, five cents each; on long distance calls, intrastate, the exact charge made by the telephone company and, on inter-state calls, defendant received a commission of fifteen per cent. The evidence shows that the full amount collected for telephone charges from guests was $2,716.11 and paid out $5,471.44. There is no evidence to show what part of this amount was received by defendant as a collecting agent and transmitted to the telephone company and how much was discount received on local calls and inter-state calls. Therefore, the only judgment the court could reach was to deny plaintiff recovery.

We cannot agree with plaintiff that it made a prima facie showing under the items of telephone charges and that the burden shifted to the defendant to produce competent controverting evidence which, if believed, will offset plaintiff's prima facie case.

Before a prima facie case is made plaintiff must make a showing as to each fact necessary to establish its case, which it wholly failed

to do in this case. Campbell et al. v. Terminal R. R. Ass'n. of St. Louis, (Mo. App.) 126 S. W. 2d 915, 918, 919.

Under item "Milner Laundry", plaintiff's evidence shows defendant collected from guests, for the twenty nine months in question, $3,539.85, and under item of "Advance Returns", $5,826.53, making a total receipts of $9,366.38; and, under "Pay Outs", "Advance", $4,028.42, and "Flat Work Laundry", $3,957.79, making a total of payouts of $7,986.21. These figures show that defendant received from guests for laundry and for advances from guests a total of $1,380.17 more than the cash books of defendant show that defendant paid out for the same items.

Plaintiff's evidence further shows that under the item of "Flat Work" paid out for laundry was included defendant's flat work, to-wit: sheets, towels, pillow cases, etc., and the evidence further shows that defendant sent what they called "Bundles for Wet Wash." In other words, the testimony shows that a part of the amount paid out for laundry was defendant's own work and a part was paid out for laundry for guests. The evidence does not show how much for each.

The evidence as to the item of laundry handled by the defendant for the twenty-nine months in question shows that defendant furnished its guests with laundry service, the most of which was sent out to other business concerns to have the work done and some of the work was done by the defendant who employed a special employee to do a part of the work for guests and this employee was paid out of the office in Detroit.

Defendant's testimony discloses that it furnished laundry service to guests; that the guests would either bring their laundry to the office and defendant would send it out for them or, on the request of guests, defendant would call at the rooms and take said laundry and send it out. Defendant's testimony is to the effect that they received a commission of fifteen or twenty per cent on laundry done by others through defendant. The charges for laundry were made against the guests having the same done and collected with the room rent and shown on the cash book of the defendant.

Under "Advances to Guests" was included some of the laundry service, together with dry cleaning and tailoring, telegrams sent for guests, and all monies advanced to guests as accommodations. Under the items of "Milner Laundry" and "Advance to Guests" it is the contention of plaintiff that all monies received by the defendant whether as collecting agents for other concerns or whether for money loaned to guests and repaid is "gross receipts" under the meaning of the lease. The trial court, under these items, found for plaintiff and ordered the amounts received under these items figured in, in reaching the amount of "gross receipts" that defendant should have paid under the lease.

With this contention, we cannot agree. We have stated in this opinion that the meaning of "gross receipts" as used in the lease is all of the gross earnings of the defendant in operating the hotel business. The defendant is not liable for monies received from guests as a collecting agent for laundry or medicines where the work and goods are furnished by others, in any respect, save as to the amount of commissions that the defendant might have received on such work. We submit that the evidence in this case is insufficient to show what part, if any, of the items under "Laundry" and "Advances to Guests" received by the defendant and shown in its cash book, was for commissions paid to it for laundry services done by others.

The facts do show, from the cash book, that more cash was received from the guests under the item of "Laundry" and "Advances to Guests" than was paid out. Yet, the cash books, under the testimony, do not show all the money paid out by defendant under these items. Defendant's Detroit office made certain payouts. All that the cash book in the office in Springfield shows was the cash received and paid out through that office. We, therefore, find against plaintiff on the items of "Laundry" and "Advances to Guests" because the evidence does not sustain the finding of the court.

We find against the plaintiff on the items of "Laundry" and "Advances to Guests" for another reason. Under the rule we must determine the meaning and intent of the parties as expressed in the language used in the lease before us and reach a construction that is fair and reasonable under all the facts and circumstances. We must consider the relationship of the parties, the subject matter of the contract, the business and circumstances attending the execution of the contract and its interpretation by the parties.

In the case at bar the lessor occupied an office in the same building leased to defendant. Its office was fifty feet from defendant's office. The lease expresses, in plain language, that the property leased was to be used in connection with the hotel business. The officers of the lessor made at least two inspections of defendant's business during the lease term. Under the plain language of the lease defendant was required to make monthly statements of the gross receipts of its business in operating this hotel and when the gross receipts of the business amounted to more than $2500.00, defendant was required to accompany the report with payment of twenty per cent of the gross receipts of the month's business when that exceeded $500.00, which defendant paid at the first of the month. Defendant made the monthly reports showing "gross receipts" of the business for room rents only and, on eight of these reports, the twenty per cent gross receipts exceeded the minimum monthly payment of $500.00, and the report was accompanied by a check for the difference, which plaintiff received and cashed without objection.

There is no question, from plaintiff's own admissions in its testimony, that plaintiff had knowledge that the defendant was furnishing to its guests laundry service for plaintiff testified that he saw advertisements of defendant to that effect. Plaintiff says that they did not see defendant's books until shortly before they sold out, September 1st, 1944, but its officers admit that, after they had seen the cash books of defendant, on which they rely for recovery in this case, they received a payment for the excess rents due it under the term "gross receipts" without objection.

We hold that such conduct on the part of plaintiff, through more than six years of receiving the rent, its opportunity to know all of the facts and its close relationship with the business being conducted by the defendant justifies us in finding that the parties to this lease themselves construed this contract and the term "gross receipts" used therein to mean "gross receipts" from room rentals. We hold that, under the law, "gross receipts" from room rentals means the total or whole earnings received by the defendant from room rentals and does not mean monies refunded to guests for unused portion for room rental period; neither does it include the sales tax collected for such unused room rental periods. Coleman v. Ford Motor Co., 195 Mo. App. 554, 193 S. W. 866 (supra); Wentzel v. Lake Lotawana Development Co. 48 S. W. 2d 185 (supra); First Nat. Bank in St. Louis v. West End Bank, 129 S. W. 2d 879 (supra); Thomas v. Utilities Bldg. Corporation, 74 S. W. 2d 578, 582.

Under item of "Sales Tax" the trial court held that defendant was liable for three per cent of sales tax collected. With this contention we cannot agree. Sales Tax constitutes no part of the business of operating a hotel, as intended by the parties, under the clear and ordinary meaning of the language used in the lease contract. It is not an incident to such business as decided by the court. When a matter is incident to a business it depends on such business or appertains to it. It depends upon or appertains to the principal business. 42 C. J. S., page 520. Sales Tax is a creature of the law and does not become a part of nor is it dependent upon the operation of a hotel or any other business.

Defendant was required, by law, to collect two per cent sales tax from its guests. The defendant was merely a collecting agency for the state and, under the plain and clear meaning of the lease contract, "gross receipts" does not cover the item of sales tax, neither does it cover the commissions, if any, paid to the defendant for such collections because such collections are not earnings of the business of operating the hotel and do not come within the terms of the lease.

We hold that the commissions allowed under the Statute are not shown by the evidence in this case to have been actually received by the defendant. The law provides that if the taxes are paid on or before the date the same become due, three per cent may be deducted

for collection, but there is no evidence in this case that the sales tax collected by the defendant was returned, as required by statute, so as to deduct the three per cent allowed for collecting. R. S. Mo. 1939, Sec. 11, 431.

Under the item "Miscellaneous" the trial court allowed plaintiff to recover the amount of cash received by the defendant. Under this item, various collections were made. First, the amount plaintiff paid the defendant for furnishing heat to plaintiff's office and to the private dining room and kitchen, which is a part of the leased building but reserved by the lessor; second, monies received by the defendant for the sale of soft drinks; third, telegrams sent through Western Union for guests. The total amount shown received by defendant from its cash books amounted to $1916.00.

We hold the court erred in granting plaintiff judgment under this item. The cash received by the defendant for heat furnished plaintiff is provided for in the lease. The lease provides that plaintiff pay to the defendant for heat furnished to its dining room and coffee shop, $28.00 per month for the months of September to April, inclusive, of each year; and for heat furnished the east portion of the ground floor of the hotel building used by plaintiff, $26.00 per month for the months of September to April, inclusive, each year. The testimony shows that these amounts of rent to be paid for heat were arrived at by figuring the actual cost of heating this portion of the building in proportion to heating the entire building based upon the cost of heating the previous year. This arrangement was not denied.

We hold that from the clear and plain meaning of the lease, itself, using the ordinary and plain meaning of the language used therein as it relates to the subject matter in question and from the surrounding circumstances, to-wit, that there was but one furnace by which the whole building had to be heated, therefore, it was a necessity that an arrangement be made between the parties for heating of the portion of the building not leased; that the parties intended that the heating be an accommodation to plaintiff and that such payments were not to be included under the term "gross receipts" reserved in the lease as rents to be paid for the premises leased. To hold otherwise, would be to place an unfair interpretation upon the lease. If we hold, as the trial court held, that the money paid for heat was to be included and rent paid thereon, under the term "gross receipts", defendant would be forced to furnish plaintiff heat at a loss of twenty per cent. Such a holding would also be against the interpretation of the parties themselves as to what was meant by the furnishing of heat under the lease. There can be no contention but that plaintiff knew that during the entire period of the lease it was paying to the defendant the sums of money stated in the lease for heat and there can be no doubt that from the statements, furnished by the defendant, showing that gross receipts were for room rents only that these sums

were not included in arriving at the "gross receipts" due plaintiff; and for more than six years plaintiff accepted these statements as correct without objection.

The items received for telegrams, included under "Miscellaneous" were collections made from guests and paid to Western Union and do not come under the term "gross receipts." If there were any commissions collected for the sending of these telegrams by the defendant, the evidence does not disclose. Therefore, the court erred in permitting plaintiff to collect for rents under telegrams sent.

There is some testimony that when patients became ill in the hotel, defendant would send out and get medicine for them and charge the amount to their account. Defendant's testimony also showed that they were paid a commission for such services but the testimony does not disclose how much commission, if any, was actually paid defendant. We, therefore, hold that plaintiff cannot collect under this part of the item.

Plaintiff sought to charge defendant, under "gross receipts" for Coca-Cola and other soft drinks sold. This item was under the term "Miscellaneous" as used in defendant's cash book. We hold that no where can we determine from the evidence in the case the amount received by defendant under this item and, therefore, find for the defendant under the evidence.

Our conclusions reached decide most of the points raised in defendant's appeal.

Under point 3 of defendant's assignments of error, we hold the trial court properly refused to permit the term "gross receipts" as used in the lease to be explained by oral testimony for the reason that there is no ambiguity in the lease.

All of the other points raised by defendant on its appeal have been passed upon by the results we reached in our decision in this case.

In determining the issues raised by the defendant and the plaintiff in their appeals, we have followed the cardinal rule in the interpretation of contracts, that is, to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. In other words, we endeavored to ascertain the meaning and the intent of the parties as expressed by the language used in the lease.

Judgment is reversed and cause remanded with instructions to enter judgment for the defendant. *Vandeventer, P. J.,* and *Blair, J.,* concur.