LACLEDE GAS COMPANY, a Corporation (Plaintiff) Respondent, MORRIS E. OSBURN, KYLE D. WILLIAMS, CHARLES L. HENSON, E. L. Mc-CLINTOCK and HENRY McKAY CARY, Commissioners, Constituting the Public Service Commission, (Intervening Plaintiffs) Respondents, v. THE CITY OF ST. LOUIS, a Municipal Corporation, JOSEPH T. HAYDEN, License Collector of the City of St. Louis, and MILTON CARPENTER, Comptroller of the City of St. Louis, (Defendants) Appellants, No. 43059—253 S. W. (2d) 832.

Court en Banc, January 9, 1953.

James E. Crowe, City Counselor, John P. McCammon and Forrest
G. Ferris, Jr., Associate City Counselors, for appellants.

844

. *Thomas A. Johnson,* General Counsel, Public Service Commission of Missouri, for intervener-respondent, *Thompson, Mitchell, Thompson & Douglas, James P. Brown* and *Edmonstone F. Thompson* for respondent.

CONKLING, J.—The City of St. Louis, Missouri, Joseph T. Hayden, the city's License Collector, and Milton Carpenter, the city's Comptroller [all hereinafter referred to as defendants] have appealed from a declaratory judgment entered in an action wherein the petition of Laclede Gas Company, a corporation, [hereinafter called plaintiff] sought the court's construction of the city's Ordinance No. 41325 [Secs. 95-97, Chap. 55, Rev. Code of St. Louis, 1948] which imposed a license tax of 5% on plaintiff's gross receipts from the sale of gas in said city. The five persons named in the caption, who constitute the Public Service Commission of Missouri, [which is hereinafter called intervenor] were permitted to intervene as plaintiffs in the cause. The defendants filed answer. The court's declaratory judgment was rendered upon the pleadings and upon a stipulation wherein the parties agreed to the hereinafter appearing facts. Inasmuch as it affirmatively appears that the amount in controversy is in excess of $7,500 there is no question as to our jurisdiction.

As a public utility plaintiff sells gas within the defendant city. Under our statutes the rates and charges of plaintiff for gas sold to its customers are subject to the jurisdiction of Intervenor. A portion of such gas so sold by plaintiffs was purchased by plaintiff from the Mississippi River Fuel Corporation [hereinafter called Mississippi]. The Federal Power Commission [having jurisdiction of Mississippi's rates and charges, 15 U. S. C. A. Sec. 717 et seq.] on April 6, 1943, initiated a proceeding which eventually resulted in lowering Mississippi's rates to plaintiff. While that proceeding was pending, on order of the Federal Power Commission and under protest, Mississippi filed on January 20, 1946, a new and lowered rate schedule. From January 20, 1946, until November 1, 1948, Mississippi, under protest, collected from plaintiff only the lower rates filed on January 20, 1946. Fearful that the lower rates it was paying Mississippi during the period in question might not be sustained, plaintiff voluntarily segregated, impounded and kept in its separate bank accounts monies which equalled the difference between the lower rates it was actually paying Mississippi and the monies it would have to pay if Mississippi succeeded in maintaining its original higher rates. Such segregated monies from its sale of gas in St. Louis for the period in question was $1,761,372.20. That sum was not segregated by plaintiff upon any order of any court or of Intervenor. Upon such last stated sum plaintiff paid for the period in question and without protest to the city a 5% license tax in the total sum of $88,068.61. The above

$1,761,372.20 was only a portion of plaintiff's gross receipts for the period in question.

It also appears that the rates charged by Interstate Natural Gas Company, Inc., were under review in proceedings before the Federal Power Commission, and that in August, 1950, plaintiff received under a decree of the United States Court of Appeals, in the Interstate rate proceeding the sum of $169,251.31. Interstate was a gas supplier of Mississippi and thus a remote supplier of plaintiff. The last above amount plaintiff had collected from its St. Louis customers during the period in question in the Interstate case. The above decree, and the stipulations filed in the Interstate rate proceeding contemplated and provided for plaintiff's refund of said $169,251.31 to plaintiff's St. Louis customers under orders of Intervenor, and that money had been subjected to the instant license tax, and plaintiff paid the city 5% of the gross amount thereof; or $8,462.57. The above $169,251.31 represented monies collected by plaintiff from its customers as part of its rates and charges and paid to Mississippi, and in turn paid by the latter to Interstate. On November 1, 1948, plaintiff's rates to its customers were reduced [834] to reflect the ultimate lower rates at which plaintiff was able to purchase gas.

From the inception of the above mentioned Mississippi and Interstate rate controversies plaintiff contemplated the refund to its customers of such savings as plaintiff might effect by those rate controversies and stood ready to pass on to its customers any saving or refund to it, in the price it paid Mississippi for gas. Plaintiff filed with Intervenor an application for an order directing the distribution by plaintiff to its customers of whatever it might save or be refunded as a result of the Mississippi and other related rate matters "after deducting from such refunds, the actual and reasonable cost of such distribution, as well as any tax required to be paid with respect thereto," etc. On June 20, 1944, Intervenor made such order and authorized such future distribution to be made by plaintiff "after deducting therefrom the actual reasonable cost of distribution and any taxes required to be paid thereon." Such provision for the deduction of taxes was also included in the stipulation between plaintiff and Intervenor which was filed in the Interstate case. Thereafter, and on the same day the instant action was filed, plaintiff filed with Intervenor another application seeking alternative authority, dependent upon the outcome of this instant case to (1) distribute to its customers the above impounded and segregated funds collected from its city customers less the cost of distribution thereof, or, (2) to distribute the above impounded and segregated funds less the taxes paid and the cost of distribution thereof.

The portion of the ordinance in question here provides: "Sec. 95. Gas Companies to pay gross receipts License Tax. Every person

engaged in the business of selling or distributing * * * gas for heating, lighting, power and refrigeration in the city shall pay the city, as a license tax, a sum equal to five per cent of the gross receipts from such business." And another section of the ordinance provides the tax levied in the above section shall be in lieu of any other excise, license or occupation tax, but not in lieu of a tax upon real or personal property. By Section 96 of the ordinance, plaintiff is required to file with the city's comptroller, semi-annually, "a sworn statement of gross receipts for such business for the six calendar months preceding the filing of such statement," and to pay to the city's license collector "an amount equal to five per cent of the gross receipts as shown by the statement so filed." The history of this ordinance is set out in City of St. Louis v. Mississippi River Fuel Corporation, 57 Fed. Supp. 549.

In its instant petition plaintiff prayed the court to declare and construe the term "gross receipts," as used in the ordinance above, to refer only to such monies as plaintiff was "entitled to retain and use for the benefit of its business"; and to also declare as the true construction of said ordinance that plaintiff, in determining its gross receipts, by which to measure the amount of its license tax liability under said ordinance, may, in future tax periods wherein monies previously taxed are [pursuant to the order of Intervenor] returned or refunded to plaintiff's customers or former customers in the city, deduct from its actual gross receipts in such tax periods the amount so returned or refunded to its customers.

In its judgment and decree the lower court found that a justiciable controversy existed; it further declared that under the ordinance, (1) the amount of the tax "is to be in relation to the benefit derived by the taxpayer from selling or distributing gas in the city"; (2) that "gross receipts," as used in the ordinance means "money received by [plaintiff] * * * for gas sold or distributed in the city * * * less such refunds in such tax period of money previously taxed as part of its 'gross receipts' "; (3) that plaintiff had been required to pay, as it had done, its license taxes, measured by sums, which included the sums plaintiff now proposes to refund pursuant to orders of Intervenor; and (4) that when plaintiff refunds to its customers and former customers the above segregated monies it "may deduct, and defendants shall allow as a deduction, the amount of such refunds from plaintiff's receipts in the [future] tax period or tax periods in which [835] the [refunds] shall be made in determining the amount of plaintiff's 'gross receipts' subject to tax * * * for such tax period or tax periods."

It is so elementary as to require no citation of authority that the basic rule of construction of an ordinance or statute is to first seek the lawmakers' intention, and if possible to effectuate that in-

tention. The law favors constructions which harmonize with reason, and which tend to avoid unjust, absurd, unreasonable or confiscatory results, or oppression. Automobile Gasoline Co. v. City of St. Louis, 326 Mo. 435, 32 S. W.(2) 281, Wood v. Deuser, 349 Mo. 1187, 164 S. W. (2) 303. This is a taxing ordinance and must be strictly construed. City of St. Louis v. Mississippi River Fuel Corporation, supra.

The very fact that the ordinance tax was fixed upon a percentage basis of gross receipts expresses a legislative intention to levy a tax which would be measured by the benefit to be realized by plaintiff from its gross receipts from the sale of gas in the city. The ordinance does not levy a fixed tax arbitrary in amount, but instead levies one which of necessity would fluctuate with the volume of gas sold and with the benefit to be derived by plaintiff as reflected by the value and amount of its gross receipts from gas sold in the city.

The word "gross" appearing in the term "gross receipts," as used in the ordinance, must have been and was there used as the direct antithesis of the word "net." In its usual and ordinary meaning "gross receipts" of a business is the whole and entire amount of the receipts without deduction. 18 Words and Phrases, Perm. Ed., page 697. On the contrary "net receipts" usually are the receipts which remain after deductions are made from the gross amount thereof of the expenses and cost of doing business, including fixed charges and depreciation. Gross receipts become net receipts after certain proper deductions are made from the gross. And in the use of the words "gross receipts," the instant ordinance, of course, precluded plaintiff from first deducting its costs and expenses of doing business, etc., in arriving at the base figure upon which it must pay the 5% tax under this ordinance.

The word "receipts" appearing in the term "gross receipts," as used in the ordinance, connotes the monies received and taken in by plaintiff from the sale of gas in the city, as distinguished from the monies paid out or expended. But does this ordinance impose a 5% tax upon, and must the tax due the city be measured by *every dollar* received by plaintiff, even though a portion of the dollars so received by plaintiff do not benefit plaintiff at all, and constitute no yardstick by which to measure the gross income from "selling or distributing gas for heating, lighting, power or refrigeration?" That question must be answered in the negative. Assume that in a given tax period the payment of the bills rendered to half of plaintiff's customers, because of erroneous computation of such bills or because of over-measurement by the meters used by that half of plaintiff's customers, increased plaintiff's gross income by $100,000; and assume that plaintiff paid the city a 5% tax upon such $100,000 of over-charges; and that upon later discovery of such

errors plaintiff refunded such over-charges of $100,000 to the customers involved: it would not be denied that under such circumstances the $100,000 would not be taxable as "gross receipts."

Consideration of the instant question, therefore, does not compel the ruling that the instant tax must be measured by *every dollar* of gross receipts without regard to the circumstances under which received, and with no regard whatever to the taxpayer's right to keep and use *all* of such gross receipts in its business. And this is particularly true because under this character of ordinance the portion of gross receipts clearly intended to be made subject to the tax must bear a relation to the privilege of doing business within the city and to the right of plaintiff to retain and use the money so received and to benefit therefrom.

While the monies now about to be refunded to the customers from whom it was received was taken by plaintiff as a portion of its gross receipts, and while [836] such monies were once taxed at 5% as gross receipts, events occurring subsequent to such receipt and taxation judicially determined, in the above rate proceedings, that as to such monies plaintiff in fact is but a mere conduit of title and temporary bailee. While plaintiff has paid taxes thereon, those monies now to be refunded are no measure of the value to plaintiff of the privilege of doing business in the city because those monies will not remain in plaintiff's possession. The theory of the instant tax is that it is a tax upon gas sold measured by gross receipts which plaintiff could use in its business. We think it would be unreasonable to hold that these monies now to be refunded bear any relation whatever to any benefit to plaintiff under the tax theory adopted by the city itself as expressed in its instant ordinance.

We are cited to no case which is wholly apposite upon the instant facts, and our search has not revealed one. But in State v. Illinois Central Railroad Co., 246 Ill. 188, 92 N. E. 814, where one question before the court was that of construction of the railroad's charter which provided for payment to the State of a fixed percentage on the "gross or total proceeds, receipts, or income" of the railroad, it was ruled that rebates lawfully refunded by the railroad to its shippers should not "be included in the gross receipts, as that phrase is used in appellee's charter." And in State v. Northwestern Telephone Exchange Co., 107 Minn. 390, 120 N. W. 534, the court considered a statute which levied a percentage tax upon the telephone company's gross earnings. It was there held that the Company could legally deduct from its gross receipts the rebates refunded to its customers for terminated or incompleted service, or for failure to render the service for which charge had been already made and which had been paid by the customers. See also, Greene County Building and Loan Assn. v. Milner Hotels, 240 Mo. App.

1048, 227 S. W. (2) 111, and American Union Express Co. v. City of St. Joseph, 66 Mo. 675.

Plaintiff relies also upon the principle announced in certain insurance cases wherein a statute levied a percentage tax upon the *gross premium receipts* of such companies, and the latter contended that, in instances where the policies had been in fact cancelled and the premiums [or a portion thereof] returned, such returned monies were not to be included in the gross receipts for tax purposes. We are cited to German Alliance Ins. Co. v. Van Cleave, 191 Ill. 410, 61 N. E. 94, People ex rel. Continental Ins. Co. v. Miller, 177 N. Y. 515, 70 N. E. 10, State ex rel. Brewster v. Wilson, 102 Kan. 752, 172 Pac. 41, State ex rel. v. Continental Ins. Co. [Ind. App.] 116 N. E. 929, State ex rel. v. Fleming, 70 Neb. 523, 97 N. W. 1063, State v. Credit Clearing House, 10 La. App. 243, 119 So. 766. The reasoning of those cases was that premiums returned was "the same in effect as if it had never been paid" for the company derived no benefit from such receipts; and that the company "was required by the statute to pay taxes only on the total amount of premiums received and earned, or, as the trial court has stated on premiums received and retained."

It is suggested that in Massachusetts Bonding & Insurance Co. v. Chorn, 274 Mo. 15, 201 S. W. 1122, this court reached a conclusion contrary to that reached in the cases cited in the preceding paragraph. But analysis of our Chorn case and of the statute there considered clearly demonstrates that that statute levied a tax upon "business done in this state" and it was not a tax upon the premiums of insurance once furnished, whether subsequently cancelled or not. The instant tax is for gas furnished as measured by a percentage of the gross receipts therefor. The two taxing theories or philosophies are basically different. When the Chorn case was before this court in 1918, upon the question of taxes for the year 1916, the parties to that case, and this court, seem not to have noticed or considered that the statute [RSMo 1909, § 7099] had been theretofore amended. See Laws Missouri 1911, page 283. And see also Laws Missouri 1931, page 242, where legislative disagreement with the result reached in the Chorn case [837] was expressed by further amendment of the statute. See also State ex rel. National Life Ins. Co. v. Hyde, 292 Mo. 342, 241 S. W. 396 and State ex rel. Hardware Mutual Casualty Co. v. Hyde, 304 Mo. 447, 264 S. W. 381 and RSMo 1949, Section 148.390. There is now sufficient expression of legislative intention to permit such deduction from even receipts which represent "business done" so that the tax upon such insurance companies' premiums in this state is expressed by the Legislature to be commensurate with benefits received and retained. The Chorn case and the subsequent history of the legislation there considered present basic differences from the instant ordinance and clearly

distinguish the question then before us from the one now here in this case.

We therefore rule that, as used in Ordinance 41325, the term "gross receipts" means only such receipts from the sale of gas in said city as the plaintiff was entitled to retain and use for the benefit of its business and out of which receipts it could pay and discharge the obligations of its business. The above noted segregated monies did not fall within the term "gross receipts" as used in Ordinance No. 41325.

We next consider the further portion of the trial court's judgment above noted under (4) of the seventh paragraph of this opinion, wherein the trial court decreed and declared that when plaintiff makes the above noted refunds to its customers it "may deduct, and defendants shall allow as a deduction, the amount of·such refunds from plaintiff's receipts in the [future] tax period or tax periods in which the [refunds] shall be made in determining the amount of plaintiff's 'gross receipts' subject to tax * * * for such tax period or tax periods."

The only issue presented by the pleadings in this case is the construction of Ordinance No. 41325. While plaintiff prayed the trial court to also declare that "the true meaning and construction" of the ordinance is such that in determining the amount of its gross receipts in a given tax period plaintiff may deduct amounts refunded in prior tax period if such refunded amounts were not gross receipts under the ordinance, the ordinance contains no language which is susceptible of such construction. And the question of the true meaning of "gross receipts" has no connection with or relationship to the question of whether plaintiff may recover the $96,531.18 heretofore paid as taxes as provided in (4) of the lower court's decree. Those two questions are separate, independent and unrelated. Our construction of the words "gross receipts" does not bring into the case any issue of the right of plaintiff to effect ·a recovery of the taxes heretofore paid to the city. It does not follow, as the circuit court ruled in its declaratory judgment, that under "the true meaning and proper construction of ordinance 41325" plaintiff may effect a recovery in the manner provided in paragraph 4 of the circuit court's decree, or in any manner. Upon that question we express no opinion whatever, for it is our view that there is no such issue in this case.

For reasons above stated we reverse the circuit court's decree and declaratory judgment and this cause is remanded to the circuit court for the entry of an appropriate declaratory judgment decree consistent with this opinion.

*Tipton, J.,* and *Ellison, C. J.,* concur; *Hyde, J.,* concurs in separate opinion filed; *Hollingsworth, Dalton* and *Leedy, JJ.,* concur and concur in separate opinion of *Hyde, J.*

HYDE, J. (concurring).—I concur in the opinion of Conkling, J. herein. The proposed refunds to customers will not even be paid out of gross receipts of any future tax periods. They will instead be paid out of the fund plaintiff already has accumulated. That is the money it collected in 1946, 1947 and 1948 and has held ever since; the money which plaintiff voluntarily segregated, impounded and kept in a separate bank account and which equaled the difference between the [838] lower rates plaintiff was actually paying and the original higher rates its suppliers were claiming the right to charge. The fact that taxes were paid on these segregated funds as gross receipts in 1946, 1947 and 1948 has no bearing whatever on the determination of what are gross receipts in subsequent periods. I think we should say the true meaning of the ordinance is that this determination must be made upon the facts as to plaintiff's receipts for each tax period and cannot be affected by what occurred during prior tax periods.

*Hollingsworth, Dalton* and *Leedy, JJ.,* concur.