FOREMOST DAIRIES, INC., a Corporation, and National Dairy Products Corporation. a Corporation, Respondents,

v.

Don THOMASON, Commissioner of Agriculture of Missouri, and Thomas F. Eagleton, Attorney General of Missouri, Appellants.

NATIONAL DAIRY PRODUCTS CORPORATION, a Corporation, Respondent,

v.

Don THOMASON, Commissioner of Agriculture of Missouri, and Thomas F. Eagleton, Attorney General of Missouri, Appellants.

No. 50046.

Supreme Court of Missouri.

En Banc.

Dec. 14, 1964.

Kuraner, Freeman, Kuraner, Oberlander & Lamkin, and Charles F. Lamkin, Jr., Kansas City, Wayne D. Hudson, General Counsel, Foremost Dairies, Inc., San Francisco, Cal., of counsel, for Foremost Dairies, Inc.

Morrison, Hecker, Cozad & Morrison and Martin J. Purcell, Kansas City, Richard L. Johnston, Chicago, Ill., of counsel, for National Dairy Products.

Rozier, Carson, Inglish, Nacy & Monaco, John W. Inglish, Jefferson City, of counsel for both respondents.

Thomas F. Eagleton, Atty. Gen., John H. Denman, Asst. Atty. Gen., Jefferson City, for appellants.

Gray L. Dorsey, Chesterfield, Riddle, O'Herin & Newberry, Malden, amici curiæ.

HOLMAN, Judge.

The respondents, Foremost Dairies, Inc., and National Dairy Products Corporation, instituted this action for a declaratory judgment to determine the validity of rules promulgated by the appellant, Don Thomason, Commissioner of Agriculture of Missouri, under the Unfair Milk Sales Practices Act, §§ 416.410–416.560,[1] and for a determination of the validity, under the Act, of pricing systems for milk products employed or proposed to be employed by respondents. The trial court held the rules invalid and issued an injunction against their enforcement. The Commissioner of Agriculture and the Attorney General, who was also a party to the cause, have appealed from such judgment.

We have appellate jurisdiction because state officers, as such, are parties. Mo. Const. (1945), Art. V, § 3, V.A.M.S.

The appeal was originally heard in Division One. An opinion was prepared but failed of adoption and the case was transferred to Court en Banc. Additional briefs were filed and the cause was reargued and resubmitted. Portions of the aforementioned opinion are here adopted without the use of quotation marks.

The Unfair Milk Sales Practices Act prohibits the sale of milk or milk products at less than cost by various handlers in the milk distribution system "with the intent or with the effect of unfairly diverting trade from a competitor, * * * or of destroying competition, or of creating a monopoly." §§ 416.415, 416.425, and 416.430. Discrimination in prices between any of the cities, towns, municipalities or counties in the state by processors or distributors, with similar intent or effect, in the sale of any milk product furnished from the same plant is prohibited. Differences in prices which reflect differences in transportation costs are not in violation of the prohibition. § 416.420. Combination sales of milk products with other products, at a combined price which is less than the aggregate of the prices for which each is offered for sale, are prohibited when done with the intent or effect above mentioned. § 416.435.

The sections of the Act primarily involved herein provide, in part, as follows:

Section 416.420. "1. No processor or distributor shall, with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, discriminate in price in the sale of any milk product furnished from the same plant between any of the towns, cities, municipalities or counties of this state; except that no violation results from different prices which reflect, in the case of a processor, the actual transportation cost from point of processing to point of sale, and, in the case of a distributor, the actual transportation cost from point of purchase to point of resale."

Section 416.440. "1. No milk processor or distributor shall, with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly, give or offer to give any milk product purchaser any rebate, discount, free service or services, advertising allowance, pay for advertising space used jointly, donation, free merchandise, rent on space used by the retailer for storing or displaying the milk processor's or distributor's merchandise, financial aid, free equipment, or any other thing of value; except the *bona fide* return by a cooperative association to its members on a patronage basis of the savings realized on products sold and distributed to the members or patrons.

"2. Proof of the giving or offer to give anything of value is *prima facie* evidence of a violation of this section.

\* \* \* \* \* \*

---

1. All section citations refer to sections of RSMo 1959, V.A.M.S.

"6. This section does not prevent a discount of two per cent or less for payment on or before a certain date."

Licenses are required of milk products manufacturers, processors and distributors. The licenses are issued by the Commissioner of Agriculture and violation of the Act is the basis for action by the commissioner to suspend or revoke such licenses. § 416.490. In addition, the commissioner is authorized to obtain injunctive relief against violations. § 416.450. A person injured by violation of the Act is authorized to sue to enjoin the violator and is given a right of action for triple damages. § 416.455.

Section 416.460 authorizes the Commissioner of Agriculture to promulgate rules and regulations to carry out the purposes of the Act. Pursuant to this authority the commissioner promulgated the rules here challenged. They are as follows:

"10. In determining cost to the processor or distributor for retail sales, all retail stops and routes in a given area should be combined and averaged to obtain a uniform cost for such area.

"In determining cost to the processor or distributor for wholesale sales, all wholesale stops and routes in a given area should be combined and averaged to obtain a uniform cost for such area.

"11. Volume pricing is a discount in price and results in a discrimination in price between localities and is therefore prohibited under the Act.

"12. Public school districts, agencies and institutions of the State of Missouri and its political subdivisions are not within the purview of Sections 416.410 to 416.560, RSMo 1959, and sales of milk products to them are not regulated by the Unfair Milk Sales Practices Act."

Insofar as Rules 10 and 11 are concerned, respondents' petition charges essentially that such regulations prevented them from establishing volume price differentials; that, as applied to such pricing practice, those

regulations are unreasonable, capricious, an abuse of discretion, beyond the powers of the commissioner and, therefore, void. The petition further charged that, if the Act is construed to authorize such regulations, the Act (for reasons therein specifically alleged) is to that extent unconstitutional. They also charge that, insofar as such regulations would be authorized by the Missouri Act, the Missouri law is in conflict with the Robinson-Patman Act (15 U.S.C. § 13) and is to that extent void. Rule 12 was attacked as unreasonable, arbitrary, capricious and beyond the authority of the commissioner.

Respondents are licensed under the Act as processors of milk products. This litigation is based primarily upon their operation in the Kansas City vicinity. Respondents' evidence showed that in their operations various methods of distribution of milk and milk products are employed. They sell such products directly to consumers on home delivery routes. They deliver the products on wholesale routes to grocery stores, restaurants, and similar customers who purchase for resale. Some wholesale customers purchase the products at respondents' plants and provide their own distribution system. Some wholesale customers purchase on a "drop shipment" basis whereby the customers purchase on a reduced delivery basis with deliveries less frequent than to other customers. The size of the customer's purchase may vary from one quart of milk by a single retail customer to hundreds of quarts by wholesale customers.

Prior to the passage of the Unfair Milk Sales Law respondents and others similarly engaged sold milk and milk products at prices which varied according to the volume purchased and the method of delivery. The law became effective on August 29, 1959. On October 8, 1959, Mr. J. S. Williamson, then Commissioner of Agriculture, issued a communication addressed to all milk processing plants distributing milk in Missouri, which was received by the respondents. In this communication the commissioner stated: "Volume pricing is not prohibited

provided it reflects the actual savings or efficiencies in relation to other volumes."

Subsequently, on January 31, 1962, the present Commissioner of Agriculture, Mr. Thomason, issued a bulletin in which he stated that changes in the interpretation expressed on October 8, 1959, "might be proper at the present time." The policy of the commissioner was expressed by Mr. Thomason as follows:

"4. Volume pricing is not prohibited provided it is not a discount in price and reflects the actual savings or efficiencies in relation to other volumes.

"5. All retail stops and routes in a given area should be combined and averaged to obtain a uniform retail cost for such area. All wholesale stops and routes in a given area should be combined and averaged to obtain a uniform wholesale cost for such area."

In November 1961, National, operating through its Sealtest Division in Kansas City, placed in effect a system of pricing for sales on its home delivery routes of milk products under which all customers would be charged the same price for its products. However, a service charge was added, depending upon the volume of the customer's purchase, per delivery. On the purchase of the equivalent of six quarts of milk or more, there was no service charge. On the equivalent of four or five quarts, the service charge was $\frac{1}{2}$¢ per quart and on three quarts or less $1\frac{1}{2}$¢ per quart.

In February 1962, Sealtest proposed to place in effect a wholesale "drop delivery" pricing plan under which customers would receive a "drop delivery savings * * * based upon dollar purchases on each delivery." The schedule of "savings" was as follows:

| "DOLLAR PURCHASE PER DELIVERY | PER CENT SAVINGS |
|---|---|
| $ 0   14.99 | None |
| 15.00 — 21.99 | 3% |
| 22.00 — 36.99 | 4% |
| 37.00 — 59.99 | 5% |
| 60.00 — 89.99 | 6% |
| 90.00 — Over | 7%" |

The Commissioner of Agriculture notified Sealtest that, in his opinion, this system of "savings" conflicted with the Act and directed its discontinuance. The plan was discontinued.

On April 3, 1962, the commissioner promulgated Rules 10 and 11 here involved, which became effective on April 13, 1962. In May 1962, Sealtest resubmitted to the commissioner its proposed drop delivery savings pricing schedule and also an alternate pricing schedule under which the price of the product would vary, depending upon the number of cases purchased on cash delivery. An example of the schedule proposed is as follows:

"Total Purchases per Delivery in Cases of Volume Items

| Product | Less than 5 | 5–6 | 7–10 | 11–17 | 18–26 | 27–Over |
|---|---|---|---|---|---|---|
| Homo Qts. | 3.08 | 2.99 | 2.97 | 2.93 | 2.90 | 2.86" |

On the basis of Rules 10 and 11, the commissioner declined to approve the proposed schedule and threatened to take action against Sealtest if it was placed in effect. Such threatened action produced this litigation.

Foremost Dairies, Inc., has a similar pricing system for its home deliveries. At the time of the hearing they had no wholesale volume prices, but previously their wholesale prices had given a graduated "savings," depending upon the volume pur-

chased, to a maximum of 7% reduction in list price.

According to respondents' evidence their sales of milk on home delivery routes in the Kansas City area have declined considerably in recent years. Five years prior to this action Foremost had 96 home delivery routes in Kansas City. At the time of the hearing they had 44. Reduction in volume of sales was an estimated 60%. Sealtest in 1955 had 78 retail routes. At the time of the hearing they had 38, with a volume loss of 40%.

Respondents attributed the reduction in the home delivery business to the change in buying habits which had diverted a large volume of purchases to the supermarkets. They also attributed the reduction to the increased volume handled by independent distributors who purchased products from other processors and distributed them through non-union drivers with emphasis on sales to larger volume purchasers only. According to witnesses for both respondents, a retail price differential system was essential to the preservation of their retail home delivery routes.

Witnesses for the respondents testified that each of the companies had made detailed studies of distribution costs in the Kansas City area. Foremost made a study of retail distribution costs for the months of March and May 1962, which, according to them, were typical months. Costs were allocated either to the route or on a unit basis. Costs allocated to the former included all direct costs of the operation of the routes such as truck expenses, driver's salary, supervisor's salary, etc. Unit costs included such things as advertising, administrative expenses, and other items which could not be attributed directly to the route operation. On such basis, a cost figure of $.3993 per serve or customer stop and $.0228 per unit was arrived at. Using these figures, Foremost demonstrated that its average delivery and sales cost per unit ranged from $.4221 per unit for

serves of one unit to $.0627 per unit for serves of ten units.

Sealtest presented evidence of a study of its retail delivery costs based on eighteen route days' study in Kansas City. It showed a total cost for 1,512 deliveries of 6,395 units of $754.56 or $.1180 per unit. The delivery cost per unit per delivery varied from $.2606 per unit for delivery of one to three units to $.0621 per unit for delivery of six units and over. Sealtest also presented evidence of a study of wholesale delivery costs for the week ending December 3, 1960. The study showed an allocation of delivery costs to "Volume Per Delivery" brackets and a percentage of sales ranging from 30.19% on dollar sales from 0–$14.99 to 6.33% on dollar sales from $90-Over per delivery.

Dr. David A. Clarke, Jr., Professor of Agricultural Economics at the University of California, who had made extensive studies of the marketing of dairy products, testified on behalf of respondents. Based upon his study of the cost of milk delivery at wholesale and retail in the State of California and the problems of volume pricing, he expressed the opinion that uniform pricing per unit of milk, at wholesale and retail to the customer regardless of the volume purchased, is "not only unreal from the economic standpoint, but it presents some important problems of equity." He stated his opinion that "flat pricing under conditions of differential cost, leads to substantial pressures, which tend to distort the normal operation of the marketing system." He stated that it tended to produce "vertical integration," a system under which retail stores, particularly chain stores, have their own milk processing facilities. Such system removes the larger customers from the market and leaves the remaining smaller customers to be served by regular distributors at increased cost. He also stated that flat pricing tends to encourage unfair trade practices, such as secret rebates and free financial aid. Doctor Clarke distinguished between earned and unearned discounts. In the

former category he included discounts for cash and discounts related to volume, and in the latter "a secret rebate, under-the-counter deals, things of this kind, designed primarily to gain a competitive advantage, in the market situation." In his opinion volume pricing in the dairy industry is not injurious to competition, but improves competition.

Dr. Charles B. Saunders, Associate Professor of Business Administration at the University of Kansas, testified that volume pricing is a common and accepted business practice throughout the business world. He expressed the opinion that the pricing of milk products to reflect differences in cost of processing, sale and delivery, resulting from different delivery methods and quantities sold, is "economically sound and defensible" and would not lead to destroying competition or unfairly diverting trade from competitors.

No evidence was offered by appellants.

The trial court found that the respondents' volume pricing systems were the result of competitive conditions and that the price differentials which they afforded were "fully justified by differences in plaintiffs' costs of serving such customers, and make only due allowance for differences in the cost of processing, sale and delivery resulting from the differing methods or quantities in which such products are sold and delivered. These pricing systems are applicable throughout the entire area of the State of Missouri served from plaintiffs' plants, and do not differ from locality to locality." The court further found that flat pricing would injure competition and that "no adverse effects upon the competitive situation in the sale of milk products have resulted from * * * introduction" of respondents' volume pricing schedules.

The court stated the following conclusions of law:

"2. The systems of cost-justified volume pricing used by plaintiffs were not introduced with the intent of, and do not have the effect of, unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly within the meaning of 416.420 or 416.440.

"3. The systems of cost-justified volume pricing shown in evidence and used by the plaintiffs do not constitute the giving or the offer to give a 'discount' within the meaning of 416.440. It was the legislative purpose in passing the Act, that the term 'discount' as used in that section should connote special and discriminatory concessions to individual customers, concessions which are not given pursuant to a system of cost-justified price differentials available to all customers.

"4. Such systems of cost-justified volume pricing do not constitute discriminations in price 'between any of the towns, cities, municipalities, or counties of this state' within the meaning of 416.420. That section is without application to volume pricing systems which are the same in each town, city, municipality and county supplied by a plant.

"5. It was not the intent of the legislature that § 416.440 would require that *all* purchasers of milk products from a processor pay the same price, that is, that the housewife who has milk delivered to her door would pay the same price as the distributor who picks up the product at the dock.

"6. 416.420 and 416.440, if construed to prohibit cost-justified volume pricing, would be unconstitutional for the reason that they would constitute a special law where a general law could be made applicable, and would deny to plaintiffs the equal protection of the law, and would deprive them of their property without due process of law, all in violation of the provisions of Sections 2 and 10 of Article I, and Section 40(30) of Article III of the Constitution of Missouri, and of the 14th Amendment to the Constitution of the United States.

"7. 416.420 and 416.440, if construed to prohibit cost-justified volume pricing, would conflict with an Act of Congress, namely, the Robinson-Patman Act (15 U.S.C., Sec. 13), and to that extent be unconstitutional and void.

"8. Rule 11 of the Commissioner, and Rule 10 to the extent it prohibits such systems of cost-justified volume pricing, are beyond the powers of the Commissioner under the Act and are void, for the reasons hereinabove stated.

"9. Rule 12 of the Commissioner is beyond the powers of the Commissioner under the Act and is void."

In Borden Company v. Thomason, Mo. Sup., 353 S.W.2d 735, the constitutionality of the Unfair Milk Sales Practices Act was upheld against an attack on numerous constitutional grounds. While the practice of volume pricing is mentioned in the Borden case, the court did not determine therein whether volume pricing is a "discount" within the meaning of § 416.440. At the time of that decision volume pricing was not prohibited by the official interpretation then in effect.

Upon this appeal it is the primary contention of appellants that the plain and unambiguous language of § 416.440 prohibits discounts and that volume pricing or quantity discounts (even though cost-justified) are, in fact, discounts and therefore are encompassed within the meaning of the word "discount" as used in said section. Respondents, on the contrary, assert that the prohibition was aimed only at discounts granted arbitrarily, usually secret "under-the-table" deals, and was not intended to prohibit uniform, cost-justified differential prices according to quantity purchased which are available to all customers.

The history and purposes of the Unfair Milk Sales Practices Act are discussed in Borden, supra. It was enacted upon the recommendation of an interim legislative committee following a series of destructive price wars in which milk had sold for as little as eight cents per half gallon in some areas. The committee concluded that legislation providing for marketing regulations was essential for the well being of the dairy industry, particularly for the protection of the small distributor and the preservation of the small dairy herds in this state. The primary purpose of the Act was to prevent the sale of milk products for less than cost. It also contains provisions prohibiting area price discrimination as well as rebates, discounts, allowances, etc. In general, in order to constitute a violation, all of the practices prohibited must be shown to have been done with the intent or effect of unfairly diverting trade from a competitor or of destroying competition or of creating a monopoly.

For reasons which will hereinafter appear, we have concluded that the word "discount," as used in § 416.440, was not intended by the legislature to include volume pricing or quantity discounts which are cost-justified price differences available to all customers. It follows from the foregoing that the commissioner had no power under the Act to promulgate Rule 11 and it is therefore void.

In view of our stated conclusion it will be unnecessary to give further consideration to certain other alternative contentions which were presented to and decided by the trial court. They are (1) the fact question as to whether the cost-justified volume pricing practices used by respondents were introduced with the intent of, or had the effect of unfairly diverting trade, etc., (2) the question of whether §§ 416.420 and 416.440, if construed to prohibit cost-justified volume pricing, would be unconstitutional for reasons stated in the conclusions of the trial court, and (3) the question as to whether said sections, if construed to prohibit cost-justified volume pricing, would be to that extent void because in conflict with the Robinson-Patman Act.

Rule 11 reads as follows: "Volume pricing is a discount in price and

results in a discrimination in price between localities and is therefore prohibited under the Act." We interpret that rule as an effort by the commissioner to make volume pricing a violation of both of the sections under discussion. He provided that volume pricing is a discount in price, which could be a violation of § 416.440, and that it "results in a discrimination in price between localities," which is prohibited by § 416.420. We are of the opinion that the commissioner was clearly in error in formulating the last-mentioned conclusion. It is our view that § 416.420 may not reasonably be construed to prohibit volume pricing. Statutes prohibiting locality discrimination in one form or another have been in effect for a considerable time. The general Missouri statute on this subject, § 416.120, was originally enacted in 1907 (Laws 1907, p. 234). Similar acts are in effect in a number of other states. See Annotations 52 A.L.R. 169, 163 A.L.R. 1124. Central Lumber Co. v. South Dakota (1912), 226 U.S. 157, 33 S.Ct. 66, 57 L.Ed. 164. The general object of such statutes is to prevent a large seller doing business in a number of localities in a state from lowering his prices temporarily in one area, and reimbursing himself for any loss incurred out of profits from higher prices received in another locality, until he had driven out his local or smaller competitors and obtained a monopoly of the business. We find no reported decision in which the suggestion has been advanced that these statutes prohibit the widely used practice (see Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219) of quantity discounts. Under a system of volume pricing the purchaser would pay the same price for the quantity purchased in each area. If we assume that a distributor sells milk in both Kansas City and Liberty at a price of 21 cents per quart or two quarts for 40 cents, we do not think that the legislature intended, by § 416.420, to provide that he is guilty of area price discrimination because a purchaser in Kansas City who bought two quarts paid less per quart than a purchaser in Liberty who purchased only one quart.

■■ We will next discuss the question as to whether volume pricing is prohibited by § 416.440. Where the meaning of a statute is clear there is no occasion for its construction and the courts will apply it as written. However, when the meaning is doubtful it becomes the duty of the courts to construe it. It is elementary that the primary rule to be applied in the construction of a statute is to ascertain and give effect to the legislative intent. Taney County v. Empire District Electric Co., Mo. Sup., 309 S.W.2d 610.

■■ As stated, appellants contend that the meaning of the word "discount" in § 416.440 is clear and unambiguous. They say that it means *all* discounts, including quantity discounts. That contention is considerably weakened by the fact that two commissioners obviously had great difficulty in arriving at that meaning. Commissioner Williamson ruled that cost-justified volume pricing was not prohibited by the Act. Subsequently, Commissioner Thomason reaffirmed that ruling but added the phrase, "provided it is not a discount in price." We doubt that the added proviso changed the original ruling. Two months later the commissioner promulgated Rule 11 which stated that the Act prohibited all volume pricing. Ordinarily, in the interpretation of statutes, courts will give consideration to the administrative interpretation thereof. England v. Eckley, Mo.Sup., 330 S.W.2d 738. Here, however, in view of the difficulties encountered by the commissioner, we can give no weight to his final interpretation of the Act as embodied in Rule 11. We have concluded that when the word "discount" in § 416.440 is considered in connection with the history and purposes of the Act, and in the light of the facts and circumstances existing in this case, its meaning is ambiguous and that it becomes our duty to construe said section.

Appellants also contend that in the construction of § 416.440 we should apply the maxim *Expressio unius est exclusio alterius* (expression of one thing is the exclusion

of another). They point out that subsection 6 of that section permits a discount of 2% or less for payment on or before a certain date. It is argued that since one specific discount is exempted it should be inferred that all other discounts are included in the prohibitory provisions of the section. The quoted maxim, however, "is merely an auxiliary rule of statutory construction, to be applied with great caution; * * * is not of universal application, or conclusive as to the meaning of a statute; and it does not constitute a formula for construction to be arbitrarily applied." 82 C.J.S. Statutes § 333b, (1953). When the weight to be accorded the rule in question is balanced against a consideration of the history and purposes of the Act, as well as certain other rules of construction hereinafter discussed, we cannot give it decisive effect.

In support of their contention as to the proper interpretation of § 416.440, respondents strongly rely on the maxim *noscitur a sociis* (it is known by its associates). "The rule or maxim is to the effect that the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it. Under this rule of noscitur a sociis, general and specific words, capable of analogous meaning, when used together, take color from each other, so that general words are restricted to a sense analogous to the less general, and the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used." 66 C.J.S. pp. 607, 608 (1950). The maxim has been applied in a number of cases in this state, including State v. Hyde, 297 Mo. 213, 248 S.W. 920 [3], State v. Hagen, Mo.App., 130 S.W.2d 250 [1], and State ex rel. Crutcher v. Koeln, 332 Mo. 1229, 61 S.W.2d 750 [9]. The rule applies to related clauses as well as related words. State v. Hagen, supra. In § 416.440(1), the prohibition is against giving any purchaser "any rebate, discount, free service or services, advertising allowance, pay for advertising space used jointly, donation, free merchandise, rent on space used by the retailer for storing or displaying the milk processor's or distributor's merchandise, financial aid, free equipment, or any other thing of value." Disregarding for the moment the word "discount," it will be noted that the other words and clauses all carry the connotation of a donation or a discriminatory gift. The words indicate the return of a part of the purchase price or the giving of something of value as an inducement to buy the seller's products and thus to divert trade from a competitor, etc. Applying the maximum *noscitur a sociis,* in considering the meaning of "discount" in connection with the related words and clauses, would indicate that it refers to an arbitrary, predatory reduction in price which is made in order to obtain business and thus divert trade from a competitor. In the manner used, the word does not suggest any intent to prohibit the use of volume pricing policies which do no more than reflect varying distribution costs, sometimes characterized as earned discounts, which are available to all customers of the distributor. In purchasing a larger quantity at a lower price the buyer is not receiving something for nothing, but in return for a larger order is receiving an earned saving the distributor is able to achieve by reason of the quantity sold.

Another rule of construction we consider applicable is that the law "favors constructions which harmonize with reason, and which tend to avoid unjust, absurd, unreasonable or confiscatory results, or oppression." Laclede Gas Co. v. City of St. Louis, 363 Mo. 842, 253 S.W.2d 832, 835. In that connection we have said that "in the construction of statutes which are not clear in meaning the results and consequences of any proposed interpretation of the statute may properly be considered as a guide as to the probable intent of the lawmaker from the language used." Bragg City Special Road Dist. v. Johnson, 323 Mo. 990, 20 S.W.2d 22, 25, 66 A.L.R. 1053. If we assume that volume pricing is prohibited by the Act, then respondents will be required to charge the same price per quart of milk for a single delivery of 1,000 quarts to a large

supermarket as they would charge for 10 quarts delivered to a neighborhood grocer. Such a practice is entirely unrealistic and would lead to unfortunate results. It is clearly a discrimination against the large purchaser. Dr. Clarke testified that it would lead to "vertical integration," which is the term applied when large retail and chain store outlets obtain their own processing and distribution facilities. Another result would be that many large distributors would discontinue selling to small-quantity purchasers and would sell to large-quantity purchasers only. The small purchasers would be required to buy from small distributors who would sell only to them and they would likely pay a higher price than would be charged under a system of volume pricing.

We also have in mind that volume pricing or quantity discounts is a practice which has been widely used in this nation throughout the history of our economy. It is economically sound and is not considered as an unfair competitive practice. "Quantity discounts are among the oldest, most widely employed and best known of discount practices. They are common in retail trade, wholesale trade, and manufacturer-jobber relations. They are common in regulated as well as unregulated price structures." Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 745, 67 S.Ct. 1015, 1016, 91 L.Ed. 1219, 1223.

We are reluctant to attribute to the legislature an intent (in using the word "discount" in § 416.440) to prohibit the practice of cost-justified volume pricing in view of the widespread approval of that practice in our economy and the damaging results which would flow from its elimination. Under the circumstances heretofore stated, we think that the legislature, if it had intended to prohibit cost-justified volume pricing, would have expressly so stated in the statute.

As indicated, we rule that the Act did not authorize the commissioner to promulgate Rule 11, and that rule is therefore void.

Very little is specifically said in any of the briefs concerning the validity of Rule 10, which reads as follows: "In determining cost to the processor or distributor for retail sales, all retail stops and routes in a given area should be combined and averaged to obtain a uniform cost for such area. In determining cost to the processor or distributor for wholesale sales, all wholesale stops and routes in a given area should be combined and averaged to obtain a uniform cost for such area." The trial court concluded that said rule, to the extent it prohibits cost-justified volume pricing, is beyond the power of the commissioner under the Act and is, to that extent, void. That conclusion is undoubtedly correct. Since we have ruled that the Act does not prohibit cost-justified volume pricing it would necessarily follow that the commissioner would not have the authority to make a rule the effect of which would be to prohibit that practice. We can readily visualize that the application of the provisions of Rule 10 might result in the establishment of an artificial cost figure which would be higher than the price the distributor would charge the large volume purchaser under a cost-justified volume pricing system based upon the actual cost of delivery. In that situation the distributor or processor would be prohibited from using the volume pricing system because of the provision of the Act which prohibits the sale of milk products for less than cost. No doubt there are other ways in which Rule 10 would interfere with the operation of a volume pricing system but the foregoing is sufficient to serve as an example. It may be that some sort of satisfactory process could be devised to determine the average cost of the product (see Borden, supra), but it should not be one which would prohibit the reasonable operation of a cost-justified volume pricing system. As stated, we approve the ruling of the trial court in regard to Rule 10.

Rule 12 reads as follows: "Public school districts, agencies and institutions of the State of Missouri and its political subdivisions are not within the purview of

Sections 416.410 to 416.560, RSMo 1959, and sales of milk products to them are not regulated by the Unfair Milk Sales Practices Act." We agree with the conclusion of the trial court that said rule is not authorized and is beyond the authority of the commissioner. In that respect, it is helpful to note the legislative history. In the Senate, two amendments to House Bill No. 255 were proposed which would have added to what is now § 416.445 exemptions covering sales "made to any school district in the State of Missouri" and sales "made to the State of Missouri or any of its political subdivisions." Both of the proposed amendments failed of adoption (Senate Journal, 70th General Assembly, Monday, May 8, 1959, pp. 1089, 1091).

The rule relied upon by the appellants, i. e., that the state and its agencies are not within the purview of a statute unless an intention to include them is clearly manifest (Hayes v. Kansas City, 362 Mo. 368, 241 S.W.2d 888) is not applicable here. Primarily, the prohibitions of the Milk Act are directed to the seller of the product, not the purchaser. Insofar as it applies to the seller, the law is not prohibitory of acts by the state or its instrumentalities and is not a limitation upon the state. By limiting what the seller may do, the state or its political subdivisions may incidentally be affected in purchases which they make, but that fact does not require application of the rule contended for by the appellants. See Helena Automobile Dealers Ass'n v. Anderson, 110 Mont. 1, 98 P.2d 371. In that case the Montana Supreme Court held that state's "Unfair Practices Act" prohibited sales below cost to the state. In so holding, the court said: "As before stated, the state is not mentioned in the Act. Whether the Act would apply to the state as a seller we need not now determine. It does not restrict the state or affect its legitimate interests as a buyer. The purpose to be accomplished by Chapter 80 can as well be defeated by sales to the state as to others. If sales below cost when made to individ-

uals for the purpose of injuring competition and destroying competition are unlawful, then such sales to the state for the same purpose are likewise unlawful—absent any express exception in favor of those selling to the state." 98 P.2d l. c. 372.

We approve other findings and conclusions of the trial court, with the exception of those which we have heretofore specifically stated need not be considered upon this appeal.

For the reasons heretofore stated, the judgment is affirmed.

STORCKMAN, DALTON, HYDE, and HENLEY, JJ., concur.

LEEDY, J., concurs in result.

EAGER, C. J., concurs in result in separate opinion filed.

EAGER, Chief Justice (concurring in result).

The principal opinion finds it unnecessary to consider the constitutionality of Sections 416.420 and 416.440, although that question was raised in the case. As a practical matter, it would seem to assume the constitutionality of the Act as a whole, though not necessarily of §§ 416.420 and 416.440. Borden Company v. Thomason et al., Mo., 353 S.W.2d 735. I recognize the principle that constitutional questions are ordinarily not decided unless it is necessary to do so; with that in mind, I merely wish to reaffirm my previous views, as expressed in my dissent in Borden, supra, at a time when the constitutionality of the whole Act was directly in question. My view then and now was and is that the Act is unconstitutional in its entirety, and consequently that all Rules promulgated thereunder would necessarily fall. I have seen no reason to depart from those views as previously expressed.